**Alexander KAUFMAN, Plaintiff,**

v.

**GUEST CAPITAL, L.L.C.,
et al., Defendants.**

**No. 03 Civ. 1509(RJH).**

United States District Court,
S.D. New York.

Jan. 25, 2005.

Joseph L. Clasen, Katherine C. Glynn, Robinson & Cole, L.L.P., New York, NY, for plaintiff.

Kevin J. Toner, Heller, Ehrman, White & McAuliffe, L.L.P., NEW YORK, NY, for Guest Capital, L.L.C., Guest Management, Inc., defendants.

Joseph L. Clasen, Robinson & Cole, L.L.P., New York, NY, for Frederick E. Guest, II, defendant.

### MEMORANDUM OPINION AND ORDER

HOLWELL, District Judge.

Alexander Kaufman brought this action against Guest Capital, L.L.C. ("GC"), Guest Management, Inc. ("GMI"), and Frederick E. Guest, II ("Guest") (collectively, "defendants"), asserting common law claims of fraudulent inducement, equitable accounting and breach of contract, as well as violations of the Colorado Securities Act. Kaufman's complaint alleges that Guest fraudulently made oral representations regarding the investment focus, risks, and strategy, which induced Kaufman to invest $500,000 for a membership stake in GC. In their answer, defendants have asserted counterclaims of breach of contract and fraud against Kaufman.

Defendants now move for summary judgment on all claims contained in the complaint and answer. For the reasons set forth below, the Court grants summary judgment for defendants on Kaufman's claims and denies summary judgment on defendants' counterclaims for breach of contract and fraud.

### FACTS

Unless otherwise indicated, the following facts are undisputed.[1]

---

1. The facts as herein recited are drawn from defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶ ___"); plaintiff's Rule 56.1 Statement of Ma-

## I. *The Parties*

### A. *GC, GMI and Guest*

GC is a limited liability corporation incorporated under Delaware law that operates as an investment business. (Defs.' 56.1 ¶¶ 1–2.) Members must contribute funds in order to purchase an interest in GC.[2] (*Id.* ¶ 2.) Those funds are then invested by GC. (*Id.*) Guest serves as the investment manager for GC and is the sole shareholder, officer and director of GMI, the manager of GC. (*Id.* ¶¶ 3–4; Guest Decl., Ex. A at 10.) As such, Guest makes all of the investment decisions for GC and is the largest single investor in GC. (Defs.' 56.1 ¶¶ 5–6.) Specifically, Guest owns 75 percent of GMI, and Harold Thau, who also serves as Chief Financial Officer of GMI, owns the remaining 25 percent of GC. (Thau Dep. Tr. 15:10–15.) Guest has an extensive education and background in finance and investing.[3] (Guest Decl., Ex. A at 16.)

### B. *Kaufman*

Kaufman is a resident of Aspen, Colorado, who invested $500,000 in GC in 2000. (Kaufman Aff. ¶ 2; Kaufman Dep. Tr. at 5:6–8.) Kaufman has worked in the lubricant industry for most of his life and describes himself as a "chemist" by profession. (Kaufman Dep. Tr. at 106:2–4; Kaufman Aff. ¶ 2.) As early as 1962, Kaufman served as executive vice president and board member of W.R. Grace & Co., a large, publicly held corporation listed in the New York Stock Exchange. (Toner Reply Decl. ¶¶ 10–11.) Kaufman's principal responsibilities at W.R. Grace & Co. included the acquisition and management

---

terial Facts in Dispute ("Pl.'s 56.1 ¶ __"); defendants' Rule 56.1 Reply Statement ("Defs.' 56.1 Reply ¶ __"); Declaration of Frederick E. Guest in support of defendants' motion for summary judgment ("Guest Decl. ¶ __") and attached exhibits; Declaration of Harold Thau in support of defendants' motion for summary judgment ("Thau Decl. ¶ __"); Declaration of Kevin J. Toner in support of defendants' motion for summary judgment ("Toner Decl. ¶ __") and attached exhibits; Transcript of deposition testimony of Alexander Kaufman attached as Exhibit G to the Declaration of Kevin J. Toner ("Kaufman Dep. Tr. at __"); Affirmation of Katherine C. Glynn in opposition to defendants' motion for summary judgment ("Glynn Affirmation ¶ __") and attached exhibits; Affidavit of Patricia Hill attached as Exhibit A to the Affirmation of Katherine C. Glynn ("Hill Aff. ¶ __"); Transcript of deposition testimony of Frederick E. Guest attached as Exhibit D to the Affirmation of Katherine C. Glynn ("Guest Dep. Tr. at __"); Transcript of deposition testimony of Harold Thau attached as Exhibit E to the Affirmation of Katherine C. Glynn ("Thau Dep. Tr. at __"); Affidavit of Alexander Kaufman in opposition to defendants' motion for summary judgment ("Kaufman Aff. ¶ __"); Reply Declaration of Harold Thau in support of defendants' motion for summary judgment ("Thau Reply Decl. ¶ __").

2. The Private Placement Memorandum states that "[a]n investment in [GC] will create a capital account for the investor." (Guest Decl., Ex. A at 3.)

3. Guest received his bachelor's degree in economics from the Wharton School of Finance of the University of Pennsylvania in 1960. (Guest Decl., Ex. A at 16.) From 1960 until 1963, Guest served as the Director of Research at Troster Singer & Company. (*Id.*) Following his tenure at Troster, Singer & Company, Guest worked at Smith, Barney & Company; New York State Urban Development Corp.; and Lehman Brothers between 1963 to 1973. (*Id.*) He then joined Bessemer Securities Corporation, a $2 billion private investment company engaged in investing in the stock market, real estate, leveraged buyouts, and venture capital, as Chairman from 1974 until 1982. (*Id.*) During that period, he also served as Vice Chairman of various subsidiaries within Bessemer Securities Corporation, as well as Chairman of Phipps Land Company. (*Id.*) From 1984 until 1996, Guest acted as President of Vinoy Development Corporation, which owned and developed a $100 million resort in Florida. (*Id.*) In 1997, Guest founded GC. (*Id.* at 2, 16.)

of businesses, and as such, he arranged fifteen corporate acquisitions on behalf of W.R. Grace & Co. (*Id.* at 11.)

In 1978, Kaufman personally acquired Hatco Corporation and subsequently "restructured the company and exchanged its corporate identity as Hatco Corporation for Kaufman Holdings Corporation in 1994." (*Id.* ¶¶ 5, 11.) The website for Kaufman Holdings Corporation describes Kaufman's role in acquiring companies and participating in joint ventures:

> [Kaufman] initiated a new era of business strength and expansion by acquiring Royal Lubricants from Shell Chemicals in 1997, Anderol [Inc.] from Hüls North America in 1997, and purchasing Atofina Canada specialty grease production facility in 2001. In addition, Kaufman formed joint ventures with Celanese AG, Kronberg, Germany to produce polyol esters in Europe in 2002 and with Cargill Industrial Oils & Lubricants to manufacture specialty esters in South America in 2003.

(*Id.*) Currently, Kaufman serves as the President and CEO of Hatco Corporation and Anderol Inc., companies that manufacture and distribute lubricants for jet engines and other engines. (Kaufman Aff. ¶ 2.) Hatco is an approved "supplier to the United States Army for all their jet engines all over the world." (Kaufman Dep. Tr. at 106:4–7.) These companies are auxiliaries of Kaufman Holdings Corporation, which is self-described on its website as a "leading producer of various specialty chemicals" serving "customers and markets through a global network of integrated sales, production, research, technical service and distribution facilities." (Toner Reply Decl. ¶ 4; *Id.*, Ex. A at 1.) Until last year, Kaufman Holding Corporation's web-

site identified Kaufman as the Chairman and President. (*Id.*, Ex. C.)

Additionally, Kaufman owns "many other businesses" and has participated in joint ventures when those companies invest in buying other companies. (Kaufman Dep. Tr. at 142:5–12.) Kaufman also has discretionary investment accounts at three major investment firms—JP Morgan, Merrill Lynch and Lehman Brothers. (*Id.* at 143:17–144:7.) Specifically, Kaufman has held an account with JP Morgan for approximately fifteen years. (*Id.* at 143:3.)

## II. *Kaufman's $500,000 Investment in GC*

### A. *GC's Luncheons*

Kaufman became acquainted with Thau over several years through parties and social gatherings in Aspen. (Kaufman Dep. Tr. at 45:5–16; Thau Dep. Tr. at 33:19–23.) In spring of 2000, Thau invited Kaufman to attend an informational luncheon held at the Little Nell Hotel in Aspen, Colorado, regarding investment opportunities in GC. (Kaufman Aff. ¶¶ 5–6; Guest Decl. ¶ 22; Thau Decl. at 29:5–7.) Thau encouraged Kaufman to attend the luncheon by explaining that he was a partner in GMI and had personally invested in GC. (Kaufman Aff. ¶ 5.) Prior to the luncheon, GC had never held informational meetings with prospective investors. (Guest Dep. Tr. at 49:21–24.) Moreover, Kaufman had never had any relationship with GC before his introduction through Thau. (Thau Decl. ¶ 3.)

Kaufman attended the spring luncheon along with fifteen to twenty other prospective investors personally invited by Thau whom Thau considered to be "sophisticated investors and sophisticated business people."[4] (Kaufman Dep. Tr. at 43–44;

---

4. In his deposition, Thau stated that he defined "sophisticated investor[s]" as "wealthy individuals who I believe have invested before in all kind of investments as well as being successful business people in their own right." (Thau Dep. Tr. at 41:4–8.)

Thau Dep. Tr. at 29:10–15; 30:4–5; 39.) At this spring luncheon, Thau introduced Guest as the spokesperson. (Thau Dep. Tr. at 34:14–15; Kaufman Aff. ¶ 7.) According to Kaufman, Guest delivered a speech stating that the minimum investment in GC was $500,000, detailing the track record of GC, and explaining his "market discipline" strategy to sell any stock immediately if it dropped 10 percent in value. (Kaufman Aff. ¶ 8.) Defendants acknowledge that Guest praised GC's track record, to the extent that its fund was at the time up by 200 percent, but contest that Guest ever represented that he mentioned the word "ten percent." (Thau Dep. Tr. at 34:20–35:2; Guest Dep. Tr. at 100:1–11.) Both parties agree, however, that the luncheon included a question and answer period following Guest's presentation. (Kaufman Aff. at 52:9–18; Thau Dep. Tr. at 35:15–16.) Kaufman only recalled asking one question regarding how the company shared its profits. (Kaufman Dep. Tr. at 53:17–23.) Kaufman did not receive any written materials at the spring luncheon. (*Id.* at 46:5–8.)

At Thau's invitation, Kaufman attended a second luncheon organized by GC in August of 2000 (the "August luncheon"). (*Id.* at 58:4–6.) Kaufman maintains that Guest promised that any investment in GC would yield a high return, "especially because the company's investment strategy was to sell stocks when they dropped a certain percentage." (Hill Aff. ¶ 3; Kaufman Aff. ¶ 8.) Additionally, Kaufman asserts that Guest stated that the investments were low risk to the extent that the investments would focus primarily on energy-related companies. (Kaufman Aff. ¶ 8.)

Kaufman did not take notes at the August luncheon. (Kaufman Dep. Tr. at 59:20–22.) Following the luncheon, Kaufman claims that he engaged in two separate conversations with two attendees, Patricia Hill and Don Crawford, who confirmed that Guest had discussed the ten percent selling policy and the purported energy focus. (Kaufman Dep. Tr. at 71–76.) In her affidavit, Hill stated that Guest described the ten percent strategy as "fail proof" and that all GC's investments would relate to technology. (Hill Aff. ¶¶ 3–4.)

Defendants contend that Guest never stated or implied that (1) any investment in GC would be low risk; (2) GC would exclusively invest in companies engaged in turbine power; (3) that an investor would never lose more than ten percent of his investment; or (4) GC had a policy of selling stocks immediately if they devalued by ten percent. (Thau Decl. ¶ 5; Guest Dep. Tr. at 101:17–20, 100:1–101:6.) Defendants admit that Guest at least orally indicated his interest in investing in companies supplying energy at the August luncheon. (Thau Decl. ¶ 6.)

B.  The Private Placement Memorandum, Subscription Agreement, Compliance Verification & Risk Factors Form and Operating Agreement ·

At the August luncheon, Kaufman informed Thau that he had decided to invest in GC. (Kaufman Aff. ¶ 10; Kaufman Dep. Tr. at 110:12–23.) In response, Thau told Kaufman that GC would send him some papers regarding the investment, and Kaufman gave Thau his mailing address. (Kaufman Dep. Tr. at 110:17–20; Thau Dep. Tr. at 52:5–12.) Consequently, GC sent Kaufman the Private Placement Memorandum ("PPM"); (2) Subscription Agreement; (3) "Compliance Verification & Risk Factors" form ("Risk Factors Form"); and (4) Operating Agreement. (Guest Decl. ¶ 23.) Kaufman did not discuss these documents with anyone. (Kaufman Dep. Tr. at 23:6–13; 24:11–14.)

### 1. The PPM

On its front cover, the PPM states that "[a]n investment in [GC] involves all the risks generally associated with any new business venture and is offered only to persons who understand and who can afford to assume such risks." (Guest Decl., Ex. A at i.) The risk factors are set forth on page 13 of the PPM, stating first that the PPM gives no "assurance that the Investment Manager's assessments of the short-term or long-term prospects of investments will prove accurate or that the Company will achieve its investment objectives." (Guest Decl., Ex. A at 13.) Moreover, the PPM states that the securities chosen by GC "may be highly speculative," to the extent that "there can be no assurance that [GC]'s investment portfolio will generate any income or will appreciate in value." (*Id.*) The PPM further states that "[a]ll investments risk the loss of capital." (*Id.*)

On page four of the executive summary, the PPM sets forth GC's investment strategy:

> The Company believes that good investment opportunities can be found in all market cycles as long as one applies a strategy of market discipline and consistency. To demonstrate the concept of market discipline, one would utilize the strategy of immediately selling off stocks which decline in value by a certain percentage, such as 10%, while continuing to purchase stocks which will grow in value. The Investment Manager anticipates that he will apply the concept of market discipline to investment decisions, but ultimately reserves the right to modify and adjust such strategy in accordance with changing market conditions.

(Guest Decl., Ex. A at 4.) The PPM also provides that "[w]hile [GC] may invest in virtually any type of security or investment, the emphasis will be upon investing in common stocks of rapidly growing companies based in the [United States]. The Company will place primary emphasis on equity securities of U.S. companies" traded on NASDAQ. (Guest Decl., Ex. A at 10.)

### 2. The Subscription Agreement

The Subscription Agreement contains several non-reliance clauses, specifically stating that the "Investor acknowledges that he has received, read, understood, and is familiar with the Memorandum and the terms of the Offering." (Guest Decl., Ex. B at 4.) The Subscription Agreement also states that the Investor:

> [A]cknowledges that, except as set forth by the [PPM], no representations or warranties have been made to him by [GC], or by any person acting on behalf of [GC], with respect to the Interests, the business of [GC], the financial condition of [GC], and/or the economic, tax, or other aspects or consequences of a subscription for the Interests, and that the Purchase has not relied upon any information concerning the Offering, written or oral, other than that contained in the [PPM] and the documents attached or referred to in the [PPM]. Furthermore, no representations were made by the Company which were in any way inconsistent with the Memorandum or its exhibits.

(*Id.* at 4–5.) The Subscription Agreement also provides that the "Investor hereby acknowledges that no representations or guarantees have been made to him as to the performance of the aforementioned securities by the Manager, or agent or representative of [GC] and the Investor understands that he may not make any return on the investment and may, in fact, lose the investment." (*Id.* at 5–6.) The Subscription Agreement again states that the "Investor recognizes that an investment in the Interests involves significant RISKS, including those set forth in the

section in the section entitled Risk factors, in the Memorandum." (*Id.* at 5.)

The Subscription Agreement further provides that the Investor represent that he "has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the Investor's investment in the Interest and is able to bear such risks." (*Id.* at 7.) Moreover, the Investor must be able to "afford a complete loss of the investment in the Interest." (*Id.*)

### 3. The Risk Factors Form

The Risk Factors Form contains a nonreliance clause at the top of the document, explaining that the form was prepared to "minimize any possibility of unauthorized statements or misunderstandings of facts that could have occurred during the presentation of our services which have influenced your decision to enter into agreement with us." (Guest Decl., Ex. C at 19.) Kaufman initialed two statements made in the Risk Factors Form representing that: (1) "no promises, statements representations or warranties have been made to me except as set out in writing in the documents received from [GC]"; and (2) "no guarantee can be given as to the financial success of this venture." (*Id.*)

### C. Kaufman's Decision to Invest

On August 25, 2000, Kaufman signed and initialed these offering documents without reading any of them and returned them to GC.[5] (Kaufman Aff. ¶ 11; Kaufman Dep. Tr. at 19:4–22:13, 27:16–28:5; Thau Dep. Tr. at 51:25–52:4.) The Subscription Agreement was notarized on August 25, 2000. (Guest Decl., Ex. B at 9.) Kaufman sent $500,000 to GC via wire

transfer on August 28, 2000. (Kaufman Aff. ¶ 11; Guest Aff. ¶ 47.)

Kaufman testified in his deposition that he had decided to invest at the August luncheon because he felt convinced that the ten percent policy would protect his investment, and that GC's purported focus on energy companies aligned with his own interests and beliefs in the lubricant industry. (Kaufman Dep. Tr. at 105–6.) As such, he made the decision to invest without looking at the papers, asking anyone for advice, or asking GC for more information. (*Id.* at 106:20–24.) At that time, he nevertheless did not understand that the investment was speculative. (Kaufman Dep. Tr. at 6:15–19.) Nor did he realize that the investment involved a high degree of risk. (*Id.* at 6:20–24.) He also did not understand that Guest could modify the investment strategy at his discretion, or that there were no limits on the diversification of the portfolio. (*Id.* at 7:7–9:21.) Instead, Kaufman testified that he understood that the investment exposed investors to low risk and exclusively involved companies supplying energy into the short-term future. (*Id.* at 13:10–2, 13:13–18, 14:17–22.) Indeed, he stated in his affidavit that had he believed that losing his investment "was even a remote possibility, [he] would never have made the investment." (Kaufman Aff. ¶ 10.)

### D. GC's Losses

Guest sent Kaufman monthly reports regarding Guest Capital. (Kaufman Dep. Tr. at 95:2–9.) These letters explained marketplace conditions and GC's positions with certain companies in which the fund had been invested. (Thau Dep. Tr. at 60:22–61:4.) However, Kaufman never

---

5.  In his deposition, Kaufman testified that he was not sure whether he had signed the Subscription Agreement prior to investing in GC. (Kaufman Dep. Tr. at 32:18–24.) However,

he admitted that the signature dates on the Subscription Agreement and wire transfer to GC were accurate. (*Id.* at 33:18–20.)

read them nor personally wrote to Guest seeking information. (Kaufman Dep. Tr. at 95:14–24.) Kaufman did, however, receive the 2000 financial report issued by GC. (Kaufman Aff. ¶ 16.)

By December of 2000, GC notified him that he had suffered short-term losses of $426,951.43 of his original investment of $500,000. (Kaufman Aff. ¶ 13; *Id.*, Ex. C.) Kaufman also discovered at that time that GC had invested twenty percent of its portfolio in Meade Instruments, a seller of amateur telescopes. (Kaufman Aff. ¶ 15; *Id.* at Ex. D.) By June of 2003, the value of Kaufman's interests had risen to $236,623.77.[6] Finally, GC exercised its right to require Kaufman to withdraw from its fund as of June 30, 2003, (Defs.' 56.1 ¶ 15), and subsequently paid Kaufman $212,961.39. (Pl.'s 56.1 ¶ 6.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment shall be granted if "there is no issue as to any material fact" and the moving party is entitled to a judgment in its favor as a matter of law. Fed. R.Civ.P. 56(c).[7] Although it is the moving party's burden to show that there is no issue as to any material fact and that they are entitled to judgment as a matter of law, when a motion for summary judgment is made and properly supported, "an adverse party may not rest upon the mere allegations or denials" of the movant's pleading, "but must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). All ambiguities and all "inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion" for summary judgment. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

In order to defeat a motion for summary judgment, the evidence must be such that, when viewed in the light most favorable to the party opposing the motion, "a reasonable juror could return a verdict" in favor of the non-movant. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Indeed, summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir.1998). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### II. *Kaufman's Common Law Fraud Claim*

Kaufman has asserted a common law fraud claim against defendants, alleging that Guest fraudulently misrepresented that (1) GC would employ "market discipline" by immediately selling stocks that declined by ten percent; and (2) GC's investments would focus on energy-related companies. (Pl.'s Mem. in Opp'n to Summary J. at 9.) As an initial matter, the parties have agreed that Colorado law applies since the alleged oral representations were made to a Colorado resident at the August luncheon in Colorado. (Defs.'

---

**6.** Kaufman does not claim that this is untrue but rather claims that because he was not afforded an accounting, he has no way of determining whether the figure is accurate. (Pl.'s 56.1 ¶ 5.)

**7.** Kaufman identifies Colorado law in providing the standard for summary judgment. However, the Supreme Court has made clear that federal courts must apply state substantive law and federal procedural law in diversity actions. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

Mem. in Supp. of Summary J. at 11 n.9; Pl.'s Mem. in Opp'n to Summary J. at 9.) Specifically, a plaintiff alleging fraud under Colorado law must establish:

> (1) a fraudulent misrepresentation of material fact was made by the defendant; (2) the plaintiff relied on the misrepresentation; (3) the plaintiff had the right to rely on, or was justified in relying on, the misrepresentation; and (4) the reliance resulted in damages.

*Balkind v. Telluride Mt. Title Co.,* 8 P.3d 581, 587 (Colo.App.2000) (citations omitted). The parties primarily disagree as to whether Kaufman may assert justifiable reliance on alleged misrepresentations in light of his experience and expertise in financial and investing matters, coupled with the clauses set forth in the Subscription Agreement and Risk Factors Form explicitly disclaiming reliance on any extra-contractual representations. Colorado law clearly establishes that the issue of reliance turns on the totality of the transaction, including important factors such as: (1) the relationship, if any, between the parties; (2) the business experience of the parties; (3) the plaintiff's access to relevant information; and (4) the plaintiff's opportunity and means to detect the alleged fraud. *Mortimer v. M.D.C./Wood, Inc.,* 854 P.2d 1307, 1309 (Colo.App.1992), *rev'd on other grounds,* 866 P.2d 1380 (Colo.1994). In particular, courts must examine whether a "person of the same or similar intelligence, education, or experience would not have relied upon such representation." *Id.; Monte Verde v. Moore,* 539 P.2d 1362, 1365 (Colo.App.1975) ("the standard of 'justified reliance' is not whether a reasonably prudent man would be justified in relying, but whether the

particular individual had the ability and right to so rely"). As such, the Court turns first to Kaufman's level of sophistication in investing and financial matters.

### A. *Kaufman's Sophistication in Finance and Investing*

Defendants argue that Kaufman is a sophisticated investor based on his substantial expertise as senior executive, owner and CEO of several international businesses, as well as his experience in buying companies, participating in joint ventures and investing in securities through discretionary investment accounts with three major financial institutions. (Defs.' Reply Mem. in Further Supp. of Mot. for Summary J. at 3–5.) Kaufman contends that his background is in chemistry, sales and corporate management, his investments are done exclusively by his hired advisors, and his wealth is not synonymous with "investment sophistication." (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 17.)

█ It is undisputed that Kaufman has built a successful career in acquiring, restructuring, owning, managing and selling several companies that spans more than forty years. (Toner Reply Decl. ¶¶ 4, 5, 10, 11; *Id.,* Ex. A at 1; Kaufman Aff. ¶ 2; Kaufman Dep. Tr. at 106:4–7, 142:5–12.)[8] Moreover, Kaufman has held discretionary investment accounts at three major investment firms, and has specifically held such an account with JP Morgan for approximately fifteen years. (Kaufman Dep. Tr. at 142:5–12, 143:17–144:7, 143:3.) Although Kaufman urges the Court to find significance in his purported lack of personal involvement in trading securities, this line of reasoning is entirely unpersuasive in light of his accomplished career in

---

8. Despite Kaufman's insistence that he is a "chemist by profession" (Kaufman Aff. ¶ 2), the Court finds that this characterization is, as defendants observed, "modest to the point of [being] misleading." (Toner Reply Decl. ¶ 3.) Indeed, Kaufman later argues that his background is in "corporate management," implying that he understands how companies operate, what earnings mean, as well as other terms and factors important to financial and investing matters. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 17.)

corporate management, mergers and acquisitions and restructuring companies. Were Kaufman to succeed on this weak and unsupported argument that only those who actually trade in securities are sophisticated investors, hardly anyone could ever be considered a sophisticated investor. Through his admitted background in "corporate management," Kaufman has accumulated vast knowledge and experience in corporate management and finance-perhaps far more than the average investor.[9] No reasonable juror could find that Kaufman was an unwitting novice to the world of securities. Accordingly, Kaufman may be considered a sophisticated investor for the purposes of analyzing his ability and right to rely on Guest's alleged misrepresentations.

### B. The Non–Reliance Clauses Contained in the Subscription Agreement and Risk Factors Form

Defendants proceed to argue that Kaufman, as a sophisticated investor, cannot claim justifiable reliance since he signed the Subscription Agreement and Risk Factors Form containing non-reliance clauses. Kaufman does not dispute that the Subscription Agreement he signed contained several clauses explicitly disclaiming reliance on any extra-contractual representations regarding the interests, business, financial condition, economic or tax consequences or performance of the

fund. (Guest Decl., Ex. B at 4–5.) Nor does Kaufman dispute that he initialed statements in the Risk Factors Form, also disclaiming reliance on any "promises, statements, representations or warranties" except those "set out in writing in the documents received from [GC]." (*Id.*, Ex. C at 19.) Rather, Kaufman contends that these non-reliance clauses are not a dispositive bar to fraud litigation, but rather one of many factors to be considered in determining justifiable reliance. (Pl.'s Mem. in Opp'n to Summary J. at 11–13.)

Colorado law is unclear as to whether non-reliance clauses set forth in offering documents preclude a sophisticated investor from asserting justifiable reliance on those representations. In the absence of controlling Colorado law in this context, defendants heavily rely on two Second Circuit cases supporting their view that a non-reliance clause specifically disclaiming reliance on extra-contractual representations precludes a sophisticated investor from asserting justifiable reliance on those representations. (Defs.' Mem. in Supp. of Mot. for Summary J. at 12.) In *Harsco Corp. v. Segui*, the Second Circuit held that the non-reliance clauses contained in the purchase agreement signed by both parties expressly barred the plaintiff from asserting either a 10b–5 claim or a New York common law fraud claim based on oral misrepresentations.[10] *Harsco Corp. v. Segui*, 91 F.3d 337, 343 (2d Cir.1996) (affirm-

---

**9.** Kaufman contends that his experience should be compared to Guest's experience in investing, arguing that "Guest's knowledge and business experience relating to securities investments is far more sophisticated and complex than Kaufman's." (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 14.) Kaufman cites no authority for his suggestion that a defendant's purportedly stronger background in investing should somehow negate a plaintiff's apparent sophistication in financial matters. Indeed, the Court finds this argument to be weak and irrelevant to the issue of Kaufman's level of expertise.

**10.** The agreement in *Harsco Corp.* contained the following non-reliance provisions

[Sellers] shall not be deemed to have made to Purchaser any representation or warranty other than as expressly made by the [sellers] in Sections 2.01 through 2.04 hereof ... Without limiting the generality of the foregoing, and notwithstanding any otherwise express representations and warranties made by the [sellers] in Sections 2.01 through 2.04 hereof ..., the [sellers] make no representation or warranty to Purchaser with respect to (a) any projections, estimates or budgets heretofore delivered to or

ing district court's dismissal of fraud claims). The Second Circuit rejected the plaintiff's arguments that the non-reliance clauses were too general to provide sufficient notice or would impermissibly insulate defendants from perpetrating fraud. *Id.* In so doing, the Second Circuit focused on the fact that the purchase agreement was "a detailed writing developed via negotiations among sophisticated business entities and their advisors." *Id.* Indeed, the plaintiff had engaged in two weeks of negotiations including confirmatory due diligence, and the purchase agreement contained fourteen detailed, single-spaced pages of representations. *Id.*

Defendants also rely on *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, in support of their view that "a sophisticated party [cannot] claim reasonable reliance where it had expressly agreed in a written contract that it had not so relied." (Defs.' Mem. in Supp. of Mot. for Summary J. at 13) (citing *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir.2003).) However, the Court does not read the case as endorsing such a broad, unconditional statement. Rather, the Second Circuit explained that in assessing the reasonableness of a plaintiff's alleged reliance, the court must "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Investment Management, LLC*, 343 F.3d at 195 (affirming district court's dismissal of

claims of fraud under New York law and 10b–5 claims). Thus, the Second Circuit concluded that where the plaintiff, a company managing between five to seven million dollars in investments, had secured from defendants "extensive contractual representations" regarding other matters, plaintiff's business sophistication and the size of the transaction, the plaintiff had not justifiably relied on defendants' other oral and written misrepresentations not reflected in the contract. *Id.* at 196. Indeed, the fact that these misrepresentations were made both orally and in writing served as additional notice to the plaintiff that it should have memorialized these understandings in the ultimate purchase agreement. *Id.*

The cases cited by Kaufman similarly decline to embrace a blanket rule providing controlling significance to non-reliance clauses when evaluating justifiable reliance at summary judgment. In *AES Corp. v. The Dow Chemical Co.*, the Third Circuit held that a non-reliance clause is *some* evidence of the absence of justifiable reliance, but is not always dispositive even if the buyer is a sophisticated investor. *AES Corp. v. The Dow Chemical Co.*, 325 F.3d 174, 181 (3d Cir.2003) (reversing district court's grant of summary judgment for defendants). The Third Circuit acknowledged that a non-reliance clause "reflect[s] the fact that the seller was unwilling to vouch for the accuracy of the information it was providing and the fact that the buyer was willing to undertake to verify the accuracy of that data for itself." *Id.* at 181. The Third Circuit added that "in

made available to Purchaser of future revenues, expenses or expenditures, future results of operations, [etc.]; or (b) any other information or documents made available to Purchaser or its counsel, accounts, or advisors with respect to [Multiserv], except as expressly covered by a representation and warranty contained in Sections 2.01 through 2.04 hereof.

*Harsco Corp.*, 91 F.3d at 342–43. The agreement also provided a merger clause stating that the agreement "contains the entire agreement between the parties hereto with respect to the transactions contemplated by this Agreement and supersedes all prior arrangements or understandings with respect thereto." *Id.* at 343.

such circumstances, a buyer who relies on seller-provided information without seeking to verify it has not acted reasonably." *Id.* However, rather than adopting a bright-line rule at the summary judgment stage, the Third Circuit held that a plaintiff buyer faced with a non-reliance clause will "have to show more to justify its reliance than would a buyer in the absence of such a contractual provision." *Id.* For example, the Third Circuit found significance in the plaintiff's allegations that the defendant was in "exclusive control" of the information necessary to avoid fraud; the plaintiff had conducted a "diligent investigation" reasonably calculated to evaluate the reliability of the defendant's representations; and the defendant had allegedly prevented the plaintiff from securing information that would have uncovered the fraud. *Id.*

■ While both parties focus on these cases, all three of these cases address the element of justifiable reliance in the context of federal securities law. In particular, *Harsco Corp.* and *AES Corp.* evaluate whether non-reliance clauses constitute forbidden waivers under the Section 29(a) of the Securities Exchange Act, 15 U.S.C. § 77cc(a), which provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this Chapter . . . shall be void." See *Harsco Corp.*, 91 F.3d at 343; *AES Corp.*, 325 F.3d at 180. The underlying concern of Section 29(a) is "whether the agreement weakens [the plaintiff's] ability to recover under the Exchange Act," *Harsco*, 91 F.3d at 343 (quotations omitted), and as such, neither of these cases bear on Colorado common law in the definitive manner that both parties urge upon this Court. Moreover, all of these cases involve fact patterns in which the parties engaged in extensive contractual negotiations, due diligence, investigative inquiries and substantial sums of money. Here, it is undisputed that Kaufman never had prior contact with GC, attended two informational luncheons and received, signed and returned the offering documents to GC without substantial conversation, inquiry, or investigation. (Thau Decl. ¶ 3; Kaufman Aff. ¶¶ 5–6, 11; Kaufman Dep. Tr. at 19:4–22:13.) Clearly, these cases, although somewhat persuasive, are not quite on point in evaluating situations, such as here, where the parties have very little contact and do not negotiate extensively prior to reaching agreement.

Ultimately, the Court deems it imprudent to examine the non-reliance clauses in an abstract fashion without delving further into the undisputed facts regarding the parties' relationship, defendants' conduct in possibly concealing the alleged fraud, Kaufman's opportunity and ability to detect the alleged fraud and the overall nature of the transaction. *Mortimer*, 854 P.2d at 1309 (a court must consider the circumstances of each case on an "ad hoc basis"); *Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1516 (10th Cir.1983) (in determining whether reliance was justified, a court must look to "all of the elements of the transaction"). By focusing almost exclusively on the issues of Kaufman's sophistication and the non-reliance clauses, the parties have essentially requested that the Court isolate Kaufman's business expertise and the offering documents as the dispositive factors in the analysis. The Court declines to fashion such a broad rule in the absence of clear Colorado precedent.[11]

---

11. Courts applying Colorado law have indicated that the "mere presence of a *general* integration clause in an agreement does not bar a claim for negligent or fraudulent misrepresentation." *Keller v. A.O. Smith Harve-* *store Products, Inc.*, 819 P.2d 69, 73 (Colo. 1991) (emphasis added); see also *King v. Horizon Corp.*, 701 F.2d 1313 (10th Cir.1983) (disclaimer clause that did not "specifically address the type of misrepresentation" made

*Zobrist,* 708 F.2d at 1516 (examining all of the elements of the transaction to determine whether reliance was justifiable). In placing the clauses in the proper context of the transaction, the Court therefore proceeds with the analysis set forth by the Colorado courts.

### C. Kaufman's Access to the Relevant Information and Opportunity to Uncover the Alleged Fraud

In their reply brief, defendants argue that Kaufman acted recklessly in failing to read the numerous warnings set forth in the PPM, Subscription Agreement and Risk Factors Form. (Defs. Reply Mem. in Further Supp. of Mot. for Summary J. at 5–6.) Moreover, they appear to contend that Kaufman had unfettered access to the offering documents that would have uncovered any possible fraud but failed to capitalize on that opportunity.[12] (*Id.*)

Colorado law has clearly established that "[if] the plaintiff has access to information that was equally available to both parties and would have led to the discovery of the true facts, the plaintiff has no right to rely upon the misrepresentation." *Balkind,* 8 P.3d at 587 (citations omitted); *Bedard v. Martin,* 100 P.3d 584, 2004 WL 2005973, at *7 (Colo.App. Sept.9, 2004) (upholding dismissal of negligent misrepresentation claim on summary judgment where plaintiff failed to check public record on ownership of property); *Brush Creek Airport, LLC v. Avion Park, L.L.C.,* 57 P.3d 738, 749 (Colo.App.2002) (affirming

judgment dismissing fraud claim where buyer had access to documents contradicting any purported misrepresentations regarding length of runway); *Cherrington v. Woods,* 132 Colo. 500, 506, 290 P.2d 226 (Colo.1955) (reversing to dismiss fraud claims where buyers had ample opportunity to ascertain every aspect of retail business); *Askey v. Fidelity Sav. Ass'n,* 37 Colo. 432, 439, 86 P. 1025 (Colo.1906) (rejecting fraud claim where petitioners failed to read certificates specifically contradicting their belief that they were preferred creditors). Moreover, Colorado courts have repeatedly articulated that reliance is "not justified when the party is on inquiry notice." See *Brush Creek Airport, LLC,* 57 P.3d at 749; *Nielson v. Scott,* 53 P.3d 777, 780 (Colo.App.2002) (dismissing fraud claims where plaintiffs had "sufficient notice" of problems with septic tank that "they should have conducted an investigation"); *M.D.C./Wood v. Mortimer,* 866 P.2d 1380, 1383 (Colo.1994) (remarking that "[i]t is most important to ascertain, in the first place, whether the statement was such that ... [the party] was *bound* to inquire and examine into its correctness himself") (quoting treatise).

Several courts have imposed inquiry notice on plaintiffs who recklessly shirked their responsibilities to read relevant documents; failed to investigate glaring inconsistencies in representations; or otherwise "buried" their heads in the sand in the face of palpable falsities. *Franze v. Equitable*

did not bar fraud claims for prior oral misrepresentations of defendant's agent). It is not clear, however, what Colorado law requires in terms of specificity so as to effect waiver of fraudulent misrepresentation claims.

12. The exact parameters of defendants' argument are not quite clear from their reply brief. Defendants contend that under Colorado law, "where a party is thus on notice of information that counters that on which he purports to rely, he is deemed to have all such

knowledge that a reasonable investigation would have revealed." (Defs.' Reply Mem. in Further Supp. of Mot. for Summary J. at 7.) Consequently, they reason that "Kaufman is charged with knowledge of the provisions of the Subscription Agreement and the PPM." (*Id.*) Moreover, they maintain that Kaufman has acknowledged that "had he known any of seven matters plainly revealed in the PPM, he never would have invested," although this argument is not further developed. (*Id.*)

*Assurance,* 296 F.3d 1250, 1254 (11th Cir. 2002) (barring claims of misrepresentation under 10b–5 where defendants allegedly misrepresented that program sold pension plans, retirement plans, or education funds plans and not life insurance because plaintiffs failed to read documents that would have allowed them to discover the alleged misrepresentations); *J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1256 (1st Cir.1996) (upholding dismissal of claims on summary judgment where the discrepancy between oral misrepresentations and prospectuses put investor plaintiffs on "discovery" notice); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 802–3 (1st Cir.1987) (imposing inquiry notice on investors faced with "great glowering clouds of the offering memorandum and the quite different forecast of [their broker]"); *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 350 (2d Cir. 1993) (prospectus detailing risk factors put investor of ordinary intelligence on inquiry notice as a matter of law); *Levine v. Prudential Bache Properties, Inc.,* 855 F.Supp. 924, 933 n. 3 (N.D.Ill.1994) (remarking that a "securities seller's written disclosures trump any contrary oral statements" and that plaintiffs cannot avoid the minimum step of reading prospectuses); *Emergent Capital Investment Management, LLC,* 343 F.3d at 195 ("[s]uccinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament") (quotations omitted).

It is undisputed that Kaufman received the PPM, Subscription Agreement, Risk Factors Form, and Operating Agreement before he wired the money to GC, but neglected to read any portions of the documents. (Kaufman Aff. ¶ 11; Kaufman Dep. Tr. 137:7.) Yet the PPM contained several statements that either directly contradicted or materially modified the alleged representations proffered by Guest.

For example, the PPM stated that the securities chosen by GC could be "highly speculative" and that GC could invest in "any type of security or investment" although the primary focus would be on "equity securities" of American companies traded on NASDAQ (Guest Decl., Ex. A at 10, 13.) Furthermore, the PPM stated that although GC would generally apply a strategy of market discipline by selling off stocks at a certain percentage, Guest "reserves the right to modify and adjust such strategy in accordance with changing market conditions." (*Id.*)

▮ These provisions directly contradicted Guest's alleged representations that (1) GC would always employ an immediate sell-off policy for stocks dropping ten percent, and (2) GC's investments would focus on energy-related companies. As such, the written provisions placed Kaufman on inquiry notice to investigate. However, Kaufman did not read or discuss the PPM with anyone. (Kaufman Dep. Tr. at 23:3–16.) Nor did he take any steps to contact GC regarding those contradictions. Yet Kaufman testified at his deposition that he would not have invested in GC had he known that the investment was "speculative and involved a high degree of risk." (Kaufman Dep. Tr. at 132:23–133:4.) Nor would he have invested had he known that the "investment manager had the right to modify and adjust the company's investment strategy at its discretion" or that "the company might invest in highly speculative securities." (Id. at 133:5–11; 134:5–8.) When asked to read the section in the PPM that stated that "[t]he investment manager reserves the right to modify the investment program in its sole discretion," Kaufman admitted that had he read that provision, he would not have invested. (*Id.* at 134:24–135:6.) Kaufman also admitted that he would not have invested if he had read the section providing that "the

investment manager has the right to pursue alternative investment strategies, employ other techniques, change the number of stocks in the portfolio, or utilize any investment philosophy that he or the manager considers appropriate." (*Id.* at 134:14–136:2.) In short, if Kaufman read the PPM, he would have uncovered any alleged fraud perpetrated by Guest by investigating further into the glaring inconsistencies between Guest's alleges statements and the representations contained in the PPM.

■ Moreover, Kaufman was placed on constructive notice that any of Guest's alleged representations were not reliable based on the non-reliance clauses contained in the offering documents. *Dodds,* 12 F.3d at 351 (investor placed on constructive notice where disclosure sheet stated that the investor acknowledged that the investments were illiquid); *Zobrist,* 708 F.2d at 1518 (charging investor with constructive notice of warnings placed in PPM). Here, the Subscription Agreement asked the investor to acknowledge that "no representations or warranties have been made to him by [GC], or by any person acting on behalf of [GC], with respect to the Interests, the business of [GC], the financial condition of [GC], and/or the economic, tax, or other aspects or consequences of a subscription for the Interests." (Guest Decl., Ex. B at 4–5.) The Subscription Agreement further provided that the "Investor hereby acknowledges that no representations or guarantees have been made to him as to the performance of the aforementioned securities by the Manager, or agent or representative of [GC]." (*Id.* at 5–6.) Similarly, the Risk Factors Form specifically stated that the form was prepared to "minimize any possibility of unauthorized statements or misunderstandings of facts that could have occurred during the presentation of our services which have influenced your decision to enter into agreement with us." (*Id.,* Ex. C

at 19.) The Risk Factors Form also contained a clause acknowledging that "no promises, statements representations or warranties have been made to me except as set out in writing in the documents received from [GC]." (*Id.*)

In sum, the offering documents should have alerted Kaufman that something was amiss. Indeed, Kaufman had full access to information sitting on his desk that could have uncovered the alleged fraud; instead, he chose to ignore these important documents out of sheer recklessness. The contradicting statements contained in the PPM as well as the non-reliance clauses imposed a duty on him to investigate whether Guest's alleged representations were indeed false. *Mortimer,* 854 P.2d at 1309; *Zobrist,* 708 F.2d at 1518–19 (investor's failure to investigate contradicting statements in PPM constituted recklessness and barred 10b–5 claim); *Bassford v. Cook,* 152 Colo. 136, 380 P.2d 907, 910 (upholding trial court's judgment for sellers where buyers had opportunity to consult engineer regarding soil problems in house but neglected to do so). At the very least, a reasonable investor with Kaufman's expertise in financial affairs would have reviewed the offering documents he was about to sign. As Kaufman himself admitted, the investment was "not modest" and therefore not a perfunctory transaction in which some verification, investigation or due diligence was unwarranted. (Kaufman Aff. ¶ 10.)

■ Additionally, Kaufman does not seriously contend that any person, whether employed by GC or not, prevented him from reading the documents or lulled him into believing that the documents were irrelevant to his investment. While Kaufman suggests that Thau "targeted" him as a wealthy person to be duped through the guise of friendship, this conclusory allegation is not supported by evidence proffered

by either party. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 14.) Although Kaufman and Thau knew each other socially for many years (Kaufman Dep. Tr. at 45:5–16; Thau Dep. Tr. at 33:19–23), Kaufman fails to proffer any evidence that Thau said or did anything to persuade him to invest in GC, other than to invite him to the luncheons. (Kaufman Dep. Tr. at 43–44, 58:4–6, 110:21–23; Kaufman Aff. ¶ 10). Given Kaufman's level of financial sophistication and absent any allegation of a fiduciary relationship, any purported friendship between Thau and Kaufman does not transform Kaufman's reliance into "justifiable" reliance. *Emergent Capital Investment, LLC,* 343 F.3d at 196.

The Court concludes that Kaufman had the access, means, and opportunity to review information that would have uncovered any fraud. No reasonable juror could conclude that Kaufman justifiably relied in light of the circumstances surrounding his claim. Accordingly, the Court finds as a matter of law that Kaufman cannot claim justifiable reliance, and as such, grants summary judgment for defendants on Kaufman's common law claim for fraudulent misrepresentation. To the extent that Kaufman asserts claims under the Colorado Securities Act, which also requires reliance or causation,[13] the Court also grants summary judgment for defendants on

these claims. *FDIC v. Refco Group, Ltd.,* 989 F.Supp. 1052, 1073 (D.Colo.1997) ("[u]nder the Colorado Securities Act, a seller of securities cannot be held liable to the buyer if the buyer had knowledge of the alleged untruth or omission") (granting summary judgment) (citations omitted).

### III. *Kaufman's Claim for Breach of Contract of the PPM and Operating Agreement*

The parties differ on whether GC's alleged failure to provide complete, audited reports containing a condensed schedule of investments constitutes a breach of contract. Defendants argue that Kaufman's breach of contract claim fails as a matter of law because he has failed to identify a governing contractual provision guaranteeing the provision of year-end schedules of investments to members. (Defs.' Reply Mem. in Further Supp. of Mot. for Summary J. at 9.)[14] Kaufman contends that there exists a material issue of fact as to whether GC breached the PPM's provision stating that members generally will receive an annual financial report of the Company. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 18.) Specifically, he cites to a letter sent by GC's auditor stating that the Company did not provide a condensed schedule of investments held at December 31, 2000. (*Id.* at 19.) That

**13.** In *Rosenthal v. Dean Witter Reynolds, Inc.,* the Supreme Court of Colorado remarked that the "purpose of any reliance requirement is to provide[ ] the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Rosenthal v. Dean Witter Reynolds, Inc.,* 908 P.2d 1095, 1101 (Colo. 1995). As such, the court concluded that allegations of reliance or causation are necessary to support a cognizable claim under the Colorado Securities Act, and that the plaintiff must establish that the defendant's alleged omission or misstatement was a "substantial factor in determining the course that resulted in plaintiff's loss." *Id.* at 1101–2. For the reasons stated above, the Court concludes

that regardless of whether Guest made alleged fraudulent statements, other factors such as Kaufman's sophistication, failure to read the offering documents, and recklessness in investigating the investment mitigate any effect of those statements.

**14.** Defendants also maintain that Kaufman cannot prove damages suffered as a consequence of the breach since he never read the offering documents. (Defs.' Mem. in Supp. of Mot. for Summary J. at 9.) In granting summary judgment on this claim on the first ground, the Court need not address this argument.

letter, he asserts, raises a material issue of fact as to whether GC's failure to provide a condensed schedule breached its duty to provide complete, accurate and detailed statements of his investments. (*Id.*)

As an initial matter, the Court notes that the offering documents are governed by Delaware law based on Section 9.4, a choice of law provision contained in the Operating Agreement.[15] The parties' choice of law provision "is to be given effect unless doing so would contravene some important public policy of the State of Colorado." *U.S. v. Novotny*, 2001 WL 1673628, at *2 n. 2 (D.Colo. Nov.8, 2001). The Court fails to discern any serious issues with applying Delaware law in the stead of Colorado law in this instance and therefore analyzes the documents under Delaware law.

■ Under Delaware law, the proper construction of a contract is "purely a question of law." *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins., Inc.*, 616 A.2d 1192, 1195 (Del.1992) (affirming grant of summary judgment based on plain and ordinary meaning of contract). Indeed, a contract "is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* at 1196. Rather, a contract is "ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Id.* Moreover, ambiguity "does not exist where the court can determine the meaning of a contract 'without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'" *Id.* (quotations and

citations omitted). Indeed, the Delaware Supreme Court held that the "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (citations omitted)

■ The only provision cited by Kaufman in support of this claim is contained in the PPM. Page 23 of the PPM states:

> Members generally will receive an annual financial report of the Company audited by the Company's accounting firm, which is BDO Seidman, LLP, following the end of each fiscal year or soon thereafter as is reasonably practicable. However, if the Company is unable to obtain financial statements on a timely basis, the Company's annual financial report may be delayed.

(Guest Decl., Ex. A at 24 (emphasis added).) From the face of the document, the Court concludes that there is no ambiguity: the Company never agreed to provide a condensed schedule of its investments. This is a matter of simple contract interpretation, and does not raise a material issue of fact. No reasonable juror could conclude that GC's failure to provide a condensed schedule of investments constituted a breach of contract where no such guarantee was made. Moreover, this Court "cannot rewrite the [PPM] and add words that the parties themselves did not include in their agreement." *University Realty Associates, Inc. v. Wendy's Old Fashioned Hamburgers of New York, Inc.*, 1992 WL 368593, at *4 (Del.Ch. Dec.11, 1992) (rejecting plaintiff's expansive interpretation of disputed lease provision which

---

**15.** Section 9.4 of the Operating Agreement provides that "[n]otwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or may be hereafter amended shall govern the limited liability company aspects of the Agreement." (Guest Decl., Ex. D at 20.)

did not mention "existing paved areas" and granting summary judgment to defendant). Accordingly, the Court grants summary judgment to defendants on Kaufman's breach of contract claim as a matter of law.

### IV. Kaufman's Entitlement to Accounting

Defendants also seek summary judgment on Kaufman's claim for accounting, arguing that the Operating Agreement adequately provides for the accounting reports which investors agreed to accept. (Defs.' Mem. in Supp. of Mot. for Summary J. at 21.) Kaufman relies on two theories, either of which he claims is sufficient to survive summary judgment.[16] First, Kaufman argues that GC holds all of the accounts, and that he has no way to access them. (Pl.'s Mem. in Supp. of Mot. for Summary J. at 20). Second, he argues that the fiduciary relationship between the parties entitles him to an accounting. (*Id.*)

As a threshold consideration, Delaware law declines to provide a remedy in equity, such as a right to accounting, where an "adequate remedy at law" exists. *Park Oil, Inc. v. Getty Refining and Marketing Co.,* 407 A.2d 533, 534 (Del.1979). Indeed, Delaware law provides a right to accounting only in the following circumstances: "(1) where there are mutual accounts between the parties; (2) where the accounts are all on one side but there are circumstances of great complication; and, (3) where a fiduciary relationship exists between the parties and a duty rests upon defendant to render an account." *Pan*

*Am. Trade & Inv. Corp. v. Commercial Metals Co.,* 94 A.2d 700, 701 (Del.Ch.1953). There is no claim that the parties possess mutual accounts, and as such, the Court proceeds to examining the second and third possibilities for accounting.

The Court finds that there is "nothing to indicate that the accounts between the parties are so complicated as not to be understood by a law court or a jury." *Messick v. Diamond State Truck Bros., Inc.,* 1980 WL 81865, at *1 (Del.Ch. Mar.12, 1980). The fact that GC invested the money of thirty other investors is insufficient to support the contention that the accounts are complicated. Accordingly, his entitlement to accounting on that ground is inappropriate.

Next, Kaufman's insistence on the propriety of equity jurisdiction based on the purported existence of a fiduciary relationship with GC is flawed. A "fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." *Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.,* 1995 WL 409015, at *2 (Del.Ch. July 5, 1995) (quotations omitted). Although there is no bright-line determination as to when parties shall be considered fiduciaries, Delaware has "recognized several other relationships which also carry the 'special' nature of a fiduciary relationship, including: general partners; administrators or executors; guardians; and, in special circumstances, joint venturers or

---

**16.** Kaufman's complaint identifies New York law as the applicable law governing the agreement between the parties. (Compl.¶ 22.) However, Kaufman now claims that Delaware law applies to the agreement based on Section 9.4 of the Operating Agreement. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 20). As discussed earlier in this Opinion, the Court will honor the parties'

choice of law provision and analyze Kaufman's right to an accounting under Delaware law. However, the Court observes that regardless of whether New York law or Delaware law applies, the result is the same. See *Kensington Pub. Corp. v. Kable News Co. Inc.,* 100 A.D.2d 802, 474 N.Y.S.2d 524, 526–27 (1st Dep't 1984).

princip[als] and their agents." *Id.* (citations omitted). In the context of a principal/agent relationship, a fiduciary relationship "will arise when there is an element of confidentiality or a joint undertaking between the principal and agent." *Id.*

Here, Kaufman fails to identify any special relationship or "special knowledge, element of confidentiality or dependence" to justify converting the purely commercial relationship between GC and Kaufman into a fiduciary relationship. *Id.* Even if the parties were fiduciaries, however, "the parties could by agreement determine the manner in which such an accounting should be had, and thereafter could, upon the statement of an account, fix by agreement the amount due to each." *Kensington Pub. Corp.*, 474 N.Y.S.2d at 526–27 (remarking that "[a]n account stated is nothing more or less than a contract express or implied between the parties") (internal quotations and citations omitted). Indeed, fiduciaries may structure their relationships and rights through contract. *Wisconsin Ave. Assoc., Inc. v. 2720 Wisconsin Ave. Co-op. Ass'n. Inc.*, 441 A.2d 956, 964 (D.C.1982) (contracts between fiduciaries generally upheld unless contrary to public policy) (applying Delaware law); *Houston v. Aramarck Corp.*, 2004 WL 2203981, at *4 (3d Cir. Oct.1, 2004) (fiduciaries may waive duties by contract). Here, the Operating Agreement explicitly provides that current members shall receive annual financial reports containing a balance sheet of the company, a statement showing the net capital appreciation or depreciation, as well as unaudited reports setting forth the member's individual capital account. (Guest Decl., Ex D at 20.) That Kaufman is now dissatisfied with any purported inadequacies he perceives in the financial reports is simply due to his own failure to read the offering documents. Indeed, Kaufman does "not seek an accounting so much as [he] seek[s] discovery of the defendants' records in order that

[he] may determine the amount of the money judgment to which [he] feel[s] [himself] entitled." *Messick*, 1980 WL 81865, at *2. Accordingly, the Court grants defendants summary judgment on Kaufman's claim for accounting.

## V. Defendants' Counterclaims

Defendants have asserted two counterclaims in their answer, alleging that Kaufman (1) breached the indemnification provision in the Subscription Agreement; and (2) committed fraud by recklessly making false representations in the Subscription Agreement that he was a sophisticated investor and understood the risks and strategy of GC's investing. In addition to seeking summary judgment on Kaufman's claims, they also contend that summary judgment on their counterclaims is appropriate.

### A. Defendants' Counterclaim for Breach of Contract

Defendants first argue that Kaufman breached the Subscription Agreement as a matter of law by failing to indemnify GC for its costs in defending itself in this action and a prior action. (Defs.' Mem. in Supp. of Summary J. at 21.) Kaufman, however, claims that Guest's alleged misrepresentations, and not his own admitted failure to read the offering documents, proximately caused the filing of these lawsuits. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 22–23.) Neither party cites to any case law for these positions.

To prevail on their breach of contract claim under Delaware law, defendants must demonstrate (1) a contractual obligation; (2) breach of that obligation by Kaufman; and (3) resulting damage to defendants. *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del.Ch.2003). In addition, any legally cognizable damages must be proximately caused by Kaufman's

alleged actions, in the sense that they were "reasonably foreseeable" at the time the contract was made. *Thomas v. Harford Mutual Ins. Co.,* 2003 WL 21742143, at *2 (Del.Super.Ct. July 25, 2003) (citations omitted); *Laifail, Inc. v. Learning 2000, Inc.,* 2002 WL 31667861, at *3 (D.Del. Nov.25, 2002) (applying Delaware law); *Automodular Assemblies (DE), Inc. v. PNC Bank, Delaware,* 2004 WL 1859828, at *7 (Del.Ch. Aug.6, 2004).

Defendants identify the appropriate contractual provision as Section III of the Subscription Agreement, which states:

> The Investor ... indemnifies ... the Company, its Manager, and its Investment Manager ... from ... (b) any and all claims which are related to or caused by the Investor's failure to fulfill any of the terms and conditions of this Agreement or by reason of Investor's breach of any of the representations, warranties and covenants of Investor contained herein or in the Investor questionnaire; and (c) any and all claims or actions which arise out of or are based upon the Investor providing material material [sic] misstatements of fact, misleading or false information to the Company or the Manager, or failing to disclose material facts in these Subscription Documents or otherwise in connection with this Offering.

(Guest Decl., Ex. B at 7–8.) Moreover, the Subscription Agreement provides that the Investor "acknowledges that he has received, read, understood and is familiar with the [PPM] and the terms of the Offering pursuant to which this Subscription is being made." (*Id.* at 4.)

■ The undisputed facts demonstrate that Kaufman did not read or understand the provisions of the PPM or any part of the offering documents, thereby breaching that provision of the Subscription Agreement. (Kaufman Dep. Tr. at 19:4–22:13; 27:16–28:5). However, it is unclear wheth-

er defendants' losses in the form of attorney's fees as a result of Kaufman's failure to read or understand the offering documents were reasonably foreseeable at the time of the contract. Because "[i]ssues of proximate cause and reasonable foreseeability are questions of fact for a jury," summary judgment on defendants' counterclaim is inappropriate. *Crowell Corp. v. Himont USA, Inc.,* 1994 WL 762663, at *4 (Del.Super.Ct. Dec.8, 1994). Accordingly, the Court denies summary judgment with respect to defendants' counterclaim for breach of contract.

## B. Defendants' Counterclaim for Common Law Fraud

■ Defendants also seek summary judgment on their counterclaim that Kaufman perpetrated fraud by recklessly signing the offering documents containing representations that he had read and understood those documents. (Defs.' Mem. in Supp. of Mot. for Summary J. at 23.) Kaufman contends that *because* he never read the documents, he lacked the requisite intent necessary in perpetrating actionable fraud. (Pl.'s Mem. in Opp'n to Mot. for Summary J. at 23.)

■ As a threshold matter, defendants must prove that Kaufman had either knowledge that the representations were false, or utter indifference to their truth or falsity in order to succeed on their fraud claim. *Trimble v. City & County of Denver,* 697 P.2d 716, 724 (Colo.1985). Additionally, Colorado law is clear that "questions of fraudulent intent are generally questions for the jury." *Marsh v. Cramer,* 16 Colo. 331, 335, 27 P. 169 (Colo.1891); *Campbell v. Creighton,* 63 Colo. 478, 486, 167 P. 975 (Colo.1917); *Karan v. Bob Post, Inc.,* 521 P.2d 1276, 1277 (Colo.App.1974). Kaufman's claim that he was unaware of the content of any statements he initialed or signed in the offering documents bears

directly on his purported knowledge with respect to those representations. As such, the issue of whether Kaufman had the requisite fraudulent intent is a matter for the jury to resolve. Accordingly, the Court denies summary judgment on defendants' counterclaim for fraud.

## VI. *Conclusion*

The Court grants summary judgment [14] for defendants on all of Kaufman's claims. Defendants' motion for summary judgment on their counterclaims for breach of contract and fraud is denied. SO ORDERED.