*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

CLINTON D. BROWN,

        *Plaintiff-Appellant,*

    *v.*

EARTHBOARD SPORTS USA, INC.; HUGH JEFFREYS;
JEFFREY A. VAUGHN; LINCOLN FINANCIAL
ADVISORS CORPORATION, d/b/a SAGEMARK
CONSULTING,

        *Defendants-Appellees.*

No. 05-6317

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 03-00193—William O. Bertelsman, District Judge.

Argued: July 17, 2006

Decided and Filed: March 16, 2007

Before: BOGGS, Chief Judge; COLE, Circuit Judge; and ROSEN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Michael R. Schmidt, COHEN, TODD, KITE & STANFORD, Cincinnati, Ohio, for Appellant. Donald J. Mooney, Jr., ULMER & BERNE, Cincinnati, Ohio, Mark E. Elsener, PORTER, WRIGHT, MORRIS & ARTHUR, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Michael R. Schmidt, COHEN, TODD, KITE & STANFORD, Cincinnati, Ohio, for Appellant. Donald J. Mooney, Jr., Pamela Kay Ginsburg, ULMER & BERNE, Cincinnati, Ohio, Mark E. Elsener, PORTER, WRIGHT, MORRIS & ARTHUR, Cincinnati, Ohio, for Appellees.

    BOGGS, C. J., delivered the opinion of the court in which COLE, J., joined. ROSEN, D. J. (pp. 18-19), delivered a separate opinion concurring in part and dissenting in part.

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

---------------

**OPINION**

---------------

BOGGS, Chief Judge.  Plaintiff-Appellant Clinton Brown, a wealthy businessman, made a risky investment in the securities of a small privately-held California company called Earthboard Sports USA ("Earthboard").  He was induced to embark on such a course of action by the "tip" he had received from Defendant-Appellee Jeffrey Vaughn, an acquaintance and financial advisor who considered Brown to be a prospective client, that a large public company was about to acquire Earthboard on extremely, even ridiculously, favorable terms.  However, the promised acquisition turned out to be an entirely fictitious creation of Earthboard's president, one Hugh Jeffreys, a felon.  When the truth was finally revealed, Brown and many others lost their investments.  Brown then sued Earthboard, Jeffreys, Vaughn, and Vaughn's employer Lincoln Financial Advisors Corp. ("Lincoln") in federal court, claiming a variety of federal and state securities violations. The district court entered default judgment against Earthboard and Jeffreys.

Subsequently, the district court granted summary judgment in favor of Vaughn and Lincoln.  Relevant to the appeal before us now, the district court held that (1) Brown's complaint that the parties had sold him unlawfully unregistered shares under Kentucky's Blue Sky law was preempted by the National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, 110 Stat. 3416 ("NSMIA"), because the securities had been sold "pursuant to" a valid federal registration exemption; and (2) Brown did not adduce sufficient evidence to create a genuine issue of material fact with respect to two vital elements of a securities fraud suit: *scienter* and loss causation.  Brown filed a timely notice of appeal.  For the reasons stated below, we reverse the district court with respect to the claims against Vaughn, but affirm summary judgment in favor of Lincoln.

**I**

As Brown appeals from summary judgment, we review the adduced evidence in the light most favorable to him.  Earthboard is a privately-held Cosa Mesa, California corporation that designs and manufactures all-terrain "extreme" skateboards and related equipment.  In 1999, it offered subscriptions in certain of its securities and filed for an exemption from federal registration requirements with the United States Securities and Exchange Commission ("SEC").  Specifically, the company filed for a federal registration exemption pursuant to Rule 506 of Regulation D, 17 C.F.R. § 230.506, a safe harbor provision authorized by Section 4(2) of the 1933 Securities Act, 15 U.S.C. § 77d(2), for limited private placements.  Rule 506 permits a private issuer to sell unregistered securities to any "accredited investor" and up to thirty-five other unaccredited purchasers, so long as certain requirements are met.  Such a filing is generally intended to exempt the sale from federal and state registration requirements pursuant to NSMIA.  Earthboard did not file any amendments to its 1999 filing or file for a new exemption.  Thus, the company continued to offer subscriptions in its securities until about 2003, all purportedly pursuant to its 1999 filing.

Brown ran his own marketing firm from 1988 until 1999.  In 1998, Brown's accountant, Gene Schindler, introduced him to Vaughn, a financial advisor and registered representative employed by Lincoln.  Vaughn solicited 401(k) business from Brown's marketing firm, "ask[ing] to be one of [Brown's] investment advisors."  Vaughn viewed Brown as a prospective client, and knew that Brown would received a large sum of money if he sold his firm.  When Brown finally sold his company in 1999, Vaughn "wanted to know what [Brown's] plans were for the earn-out money."  Thereafter, Vaughn contacted Brown periodically.  During that time, it seems that Brown and Vaughn met on social occasions, playing golf occasionally, taking a golf vacation together at Brown's Arizona home, and enjoying Brown's time-share jet.  They were both fans of Indiana University's basketball team, and they attended an Indiana/Kentucky game together.  Brown dined

at Vaughn's home at least once, Vaughn attended a Christmas party at Brown's home, and they attended a few charity-benefit dinners together.

Apparently, in August 2001, Vaughn first heard about Earthboard from his builder, who told him that the company was raising capital for expansion and put him in contact with the company's president, Jeffreys. Vaughn spoke with Jeffreys by telephone in August 2001, and again in late September 2001. They apparently did not meet each other in person until March 2002. According to Brown, Jeffreys told Vaughn on the telephone that Earthboard was involved in acquisition negotiations with VANS, a publicly-traded footwear company, and that, according to the terms of the deal, one share of Earthboard's securities would be exchanged for one share of VANS when the transaction finally closed. At that time, VANS shares were trading at about $12, but Jeffreys offered his company's shares to Vaughn for just $1 apiece. Thus, Vaughn stood to realize a 1100% capital gain when and if the promised transaction was closed. It was almost too good to be true.

Armed with what he probably took to be illicit or illegal "insider information," Vaughn allegedly decided to reap the rewards. Of course, the essential value of such an illicit "tip" lies in its concealment from the public eye, so it was probably impossible for Vaughn or anyone else to conduct any proper investigation of the transaction. But Vaughn allegedly did not allow his fundamental ignorance about Jeffreys, a felon previously convicted of fraud, or about the supposed Earthboard-VANS transaction, to govern his decisions. Of course, there was apparently not an ounce of truth to Jeffreys's "tips."[1]

According to the evidence adduced by Brown, Vaughn started by investing his own money in this scheme, and he ultimately purchased about $228,000 worth of Earthboard shares. He signed a subscription agreement on September 25, 2001, and purchased 100,000 shares for $1 per share. The company seems to have accidentally sent him an extra 100,000 shares around that time, though it rescinded those surplus shares some time later. After introducing investors such as Brown to the "opportunity," he purchased another 99,000 shares on his own account for $99,000 on March 3, 2002, and the company gave him an additional 7,000 shares for free at that time "in lieu of [paying] me a commission," presumably to thank him for advising investors like Brown about the opportunity. He purchased another 29,000 shares on his own account in December 2002 for $1 per share.

After deciding to invest for himself, Vaughn began to solicit friends and acquaintances to participate in this "opportunity." Taking the evidence in the light most favorable to Brown, Vaughn contacted Brown in late November or early December 2001 to tell him that he "wanted the opportunity to prove to . . . [Brown] how valuable he could be as a financial advisor and that he had an investment opportunity." Vaughn "wanted to meet [Brown] to discuss it." Due to "a sense of urgency in the phone call," Brown agreed to meet Vaughn for lunch about two days later. At that meeting, Vaughn "shared with . . . [Brown] the details of this privately held enterprise called Earthboard, [and] its imminent sale to a publicly traded firm called VANS." To bolster the story's veracity, Vaughn allegedly lied to Brown by claiming that Earthboard's president, Jeffreys, was "a personal friend or acquaintance of his, that they had done business before in some way, shape or form and that [Jeffreys] owed him a favor." Vaughn then explained that subscriptions in Earthboard stock were available to a limited group of investors at $6 per share, and that the purported one-for-one stock swap upon the transaction's closing offered Brown the prospect of doubling his investment overnight. But Vaughn warned that time was pressing, for the VANS transaction was "imminent and . . . [Brown] needed to move quickly if [he] wanted to be a part of it."

---

[1] Jeffreys recently pleaded guilty to violating federal securities fraud laws, and has been sentenced to 41 months in federal prison. *United States v. Jeffreys*, 8:05-cr-00184-DOC (C.D. Cal. 2006). The SEC has also filed a still-pending civil securities suit against Jeffreys and Earthboard, seeking recovery of some of the illicit gains. *Sec. and Exch. Comm'n v. Jeffreys et al.*, 1:05-cv-00372-RWR-DAR (D. D.C.).

Brown said he was interested, and Vaughn replied "I need to get you a subscription agreement." Vaughn made arrangements to have a subscription agreement sent to Brown by fax. Earthboard sent the subscription agreement to Brown on December 5, 2001. Brown consulted his financial advisors, two of whom specifically questioned how Vaughn could have access to such inside information about an unannounced transaction involving a public company, but Brown would not be deterred. Relying entirely on Vaughn's "tip," Brown saw this as an opportunity to invest in VANS, a company he found to be "solid," though he did not independently investigate Earthboard.

Brown received his subscription agreement and wire transfer instructions directly from Earthboard. Brown claims that Vaughn assisted him in completing the form. He clearly saw "$1" listed as the original share price, and it had been marked out and replaced by "$6." Brown assumed the stock price had risen because of the imminent transaction. He neither saw nor asked for a Private Placement Memorandum ("PPM"), though it was referenced in the subscription agreement he had signed. He faxed the completed subscription form directly to Earthboard on December 13, 2001, requesting 100,000 shares. Vaughn then faxed wire instructions to Brown from Lincoln's fax machine, and Brown finally wired $600,000 to Earthboard.

After completing this transaction, Vaughn and Brown engaged in numerous conversations regarding their investments in Earthboard, and both spoke about the fluctuating price of VANS stock. Brown asked Vaughn to "[s]end me whatever you get" from Earthboard, and Vaughn sent press releases and announcements from Earthboard to Brown, who apparently did not receive them directly from Earthboard. On January 9, 2002, Vaughn faxed an Earthboard press release to Brown from Lincoln's fax machine, wherein Earthboard announced a "definitive agreement" to have "its stock acquired by a publicly traded major footwear company." According to this "press release," Earthboard stock would be exchanged on a "one for one basis," apparently confirming the lies told to Brown. Brown continued to follow VANS stock, assuming that the transaction was complete and awaiting only public announcement. Brown and Vaughn even discussed whether to sell or hold the VANS stock after the merger. Vaughn kept assuring Brown that the transaction with VANS was "imminent," and so Brown continued to believe that Vaughn remained in constant contact with Earthboard's management. In fact, however, as of January 2002, Vaughn had allegedly not yet even met with Earthboard's president in person, and there is a genuine issue of material fact with respect to the question of whether had he conducted any due diligence about Earthboard or the rumored transaction prior to soliciting Brown: in his deposition, Vaughn at first claims that he personally met Jeffreys and toured Earthboard's factory in early 2001, but almost immediately he seems to have corrected himself by admitting that the meeting and tour did not occur until March 2002.

VANS shares having risen to $14, Brown decided to purchase an additional 40,000 shares of Earthboard at $6 per share on February 28, 2002. For this investment, he signed a new subscription agreement for his entire purchase of 140,000 shares (for a total investment of $840,000), which contained more complete and legible disclosures than the subscription agreement that he had received in December 2001. This agreement warned that the securities "have not been registered" and that the securities were offered pursuant to Section 4(2) of the 1933 Securities Act. To make this purchase, Brown again acknowledged that he was an "accredited investor" and that he had relied solely on his own independent investigation in making the investment decision. Brown claims that he asked for, but never received, Earthboard's financial statements, the offering circular, the PPM, and any other disclosures about the company.

Meanwhile, as we noted above, Vaughn himself purchased another 99,000 shares of Earthboard on March 3, 2002, and received an additional 7,000 shares from Earthboard "in lieu of" commission. In December 2002, Vaughn sent a letter of instruction on Lincoln stationary to Earthboard's transfer agent, purchasing another 29,000 shares. In July 2003, Vaughn seems to have purchased another 16,500 shares from his neighbor, Charles Goebel, who had earlier purchased the shares in response to Vaughn's pitch.

Time passed, but the fictitious transaction never closed, and it was finally revealed that the whole scheme was fraudulent. Brown filed a complaint against all defendants in September 2003, raising a host of federal and state claims, and filed an amended complaint on November 8, 2004. On May 27, 2005, the district court entered default judgment against Earthboard and Jeffreys, holding them jointly and severally liable for $840,000 plus pre- and post-judgment interest (representing Brown's entire investment) even though those parties are almost certainly judgment-proof. On August 2, 2005, the district court entered summary judgment in favor of Vaughn and Lincoln, holding, in relevant part, that (1) the Kentucky Blue Sky law is preempted by federal securities regulations respecting covered offerings filed pursuant to the NSMIA, and (2) Brown could not prove loss causation and *scienter* for his claims against Vaughn. The claim against Lincoln was dismissed because it depended entirely on the claim against Vaughn. Brown filed a timely appeal.

## II

The district court exercised federal question jurisdiction with respect to Brown's federal claims, 28 U.S.C. § 1331, and took supplemental jurisdiction over the Kentucky claims pursuant to 28 U.S.C. § 1367(a). The district court granted summary judgment based on its analysis and application of federal law. We review *de novo* the district court's legal conclusions, including matters of statutory interpretation. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005); *Hoffman v. Comshare, Inc. (In re Comshare, Inc. Sec. Lit.)*, 183 F.3d 542, 547 (6th Cir. 1999).

### A

Brown's first claim on appeal is that the district court erred in holding that federal law preempts his state Blue Sky law claims.[2] NSMIA, which in pertinent part amended Section 18(a)(1)(A) of the 1933 Securities Act, 15 U.S.C. § 77r(a)(1)(A), preempts state regulation with respect to "covered securities."[3] "The States cannot, in the exercise of control over local laws and practice, vest state courts with power to violate the supreme law of the land." *Kalb v. Feuerstein*, 308 U.S. 433, 439 (1940). According to Section 18(b)(4)(D) of the 1933 Securities Act, 15 U.S.C. § 77r(b)(4)(D), a "covered security" is, *inter alia*, any security exempt from federal securities registration "pursuant to – . . . Commission rules or regulations issued under § 4(2)" of the 1933 Act. *See* 15 U.S.C. § 77d(2). The parties agree that the offering was purportedly made "pursuant to" Rule 506 based on Earthboard's 1999 filing.

### 1

The parties differ in their interpretation of the effect of Earthboard's 1999 filing for Rule 506 exemption. Brown claims that an offering must actually meet the conditions established by the SEC regulation in order to qualify as a "covered security" exempted from state registration requirements by NSMIA. He further claims that Earthboard's offering did not, in fact, qualify as a "covered security" under Rule 506. The defendants answer that NSMIA exempts, *inter alia*, all non-public securities from state regulation so long as the company has attempted to qualify for a valid federal

---

[2]As the state statute reads: "It is unlawful for any person to offer or sell any security in this state, unless the security is registered under this chapter, or the security or transaction is exempt under this chapter, or the security is a covered security." Ky. Rev. Stat. Ann. § 292.340. The state statute incorporates the federal definition of a "covered security." 15 U.S.C. § 77r(b)(4)(D).

[3]The statute reads: "a) Scope of exemption. Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof – (1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that – (A) is a covered security; or (B) will be a covered security upon completion of the transaction . . . ." 15 U.S.C. §§ 77r(a)(1)(A) – (B).

exemption or has purported that the securities are offered "pursuant to" an exemption. Moreover, they argue that the Earthboard offering actually qualified for Rule 506 exemption. The district court held that the simple fact that the 1999 filing had been entered under the rubric of a federal exemption entitled it to federal preemption pursuant to NSMIA. District courts and state courts have split on the question of whether filings must actually qualify for a federal securities registration exemption in order to be entitled to NSMIA preemption. To the best of our knowledge, no federal appeals court has yet ruled on this question. We now agree with those court that have held that offerings must actually qualify for a valid federal securities registration exemption in order to enjoy NSMIA preemption.

In *Temple v. Gorman*, 201 F. Supp. 2d 1238 (S.D. Fla. 2002), the district court held that Congress broadly preempted state law registration actions in passing NSMIA. In that case, the plaintiffs asserted that their state law claims were not preempted as the securities were not actually exempt because they did not meet Rule 506's (or any other exemption's) requirements. *Id.* at 1243. The district court did not dispute that allegation, but noted that Congress's purpose in passing NSMIA was "to further and advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by, as a general rule, designating the Federal government as the exclusive regulator of national offerings of securities." *Ibid* (quoting H.R. REP. No. 104-622, at 16 (1996)). Based on this "purpose," as stated in the legislative gloss, the *Temple* court held that

> the securities in this case were offered or sold pursuant to a Commission rule or regulation adopted under section 4(2). . . . [and] [r]egardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal covered securities because they were sold pursuant to those rules.

*Id.* at 1243-44 (internal quotation marks omitted). As such, the *Temple* court held that the state's Blue Sky law was preempted by the fact that the defendants had *attempted* or *purported* to qualify for a legitimate federal exemption. Several district courts have followed *Temple*'s reasoning. *See Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1116 (N. D. Okla. 2003); *Pinnacle Commc'ns. Int'l, Inc. v. Am. Family Mortgage Corp.*, 417 F. Supp. 2d 1073, 1087 (D. Minn. 2006) ("When an offering purports to be exempt under federal Regulation D, any allegation of improper registration is covered exclusively by federal law.").

Other courts have roundly rejected *Temple*'s reasoning. The Supreme Court of Alabama raised the first challenge to *Temple*'s broad-preemption reasoning when it required the defendants claiming NSMIA preemption for their offering, which had been sold pursuant to Rule 506 exemption, to prove that the challenged securities actually qualified for a valid federal exemption. *Buist v. Time Domain Corp.*, 926 So. 2d 290, 2005 Ala. LEXIS 120 at *13-*20 (Ala. 2005).

Several federal district courts have approved *Buist*'s line of reasoning. One district court noted that the "plain language" of the securities laws defines a "covered security" as "one that 'is exempt from registration under this title pursuant to . . . Commission rules or regulations.'" *AFA Private Equity Fund 1 v. Miresco Inv. Servs.*, No. 02-74650, 2005 U.S. Dist. LEXIS 22071, at *26 (E.D. Mich. Sept. 30, 2005). The *Miresco* court required defendants to "present evidence showing that the securities at issue here are exempt from registration under the rules adopted by the SEC under § 4(2)" and held that "it is [defendant's] burden, as the party relying on the exemption, to establish that the exemption applies and that all conditions of the exemption had been satisfied." *Ibid.* Another court noted that

> [t]o the extent that *Temple* can be read to support the principle of broad preemption that the defendants urge, this Court declines to follow that case. . . . This Court has

found no authority for [the broad preemption principle] . . . . [and c]ontrary to *Temple*, most commentators have stated the obvious: a security has to actually be a 'covered security' before federal preemption applies.

*Hamby v. Clearwater Consulting Concepts, LLP*, No. 4:04CV02254 JLH, 2006 U.S. Dist. LEXIS 26886, at *16 n.2 (E.D. Ark. April 25, 2006) (citations omitted). This general line of reasoning has been repeated even more recently:

> The *Temple* court read language into the statute that does not appear there. A security is covered if it is exempt from registration . . . . Nowhere does the statute indicate that a security may satisfy the definition if it is sold pursuant to a putative exemption. If Congress had intended that an offeror's representation of exemption should suffice it could have said so, but did not. Such an intent seems unlikely, in any event; that a defendant could avoid liability under state law simply by declaiming its alleged compliance with Regulation D is an unsavory proposition and would eviscerate the statute. Nor is it necessary to look to the legislative history; the statute is unambiguous.

*Grubka v. WebAccess Int'l*, 2006 U.S. Dist. LEXIS 44721, 28-29 (D. Colo. 2006) (citations and internal quotation marks omitted). *See also Myers v. OTR Media, Inc.*, No. 1:05CV-101-M, 2005 U.S. Dist. LEXIS 18779, at *15 (W.D. Ky. Aug. 30, 2005) (denying plaintiff's motion for summary judgment where defendants claim NSMIA preemption because "Defendants have proffered evidence sufficient to create a question of fact as to whether they are exempt under Rule 506.").

We likewise reject *Temple*'s approach. Under the prevailing view of the Commerce Clause's grant of authority, *Gonzales v. Raich*, 545 U.S. 1, 125 S. Ct. 2195, 2205-09 (2005), Congress has clearly been authorized to regulate the trading of securities. This includes the power to preempt contravening state regulations. Congress could in fact decide to occupy the entire field of securities regulation and preempt all state laws as they pertain to securities.[4] Appellees urge us to believe that Congress actually performed a feat only slightly narrower, for to hold that NSMIA preempts state regulation wherever offerings merely *purport* to be filed pursuant to a valid federal registration exemption, or where parties have filed for, but fail to qualify for, an SEC registration exemption, would effectively eviscerate state registration requirements. In such a world, state registration requirements could be avoided merely by adding spurious boilerplate language to subscription agreements suggesting that the offerings were "covered," or by filing bogus documents with the SEC. Congress indubitably possesses the power to accomplish that end.

However, it is dispositive to our inquiry that Congress chose not to include broadly preemptive language when it enacted NSMIA. Instead, the statute plainly restricts its preemptive scope to "covered securities," and it neither defines, nor requires the SEC to define, "covered securities" in a fashion that would actually include all securities. The statute thus does not expressly preempt state laws with respect to non-"covered" securities, nor does the statute's text reveal an implied intent to preempt all state statutes in the field. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000). Moreover, far from defining "covered securities" in a manner that generally incorporates all securities, the SEC has promulgated specific requirements that must be met in order for a security to be "covered." Therefore, we hold that NSMIA preempts state securities registration

---

[4]"It is clearly within Congress' powers to establish an exclusive federal forum to adjudicate issues of federal law in a particular area that Congress has the authority to regulate under the Constitution. Whether it has done so in a specific case is the question that must be answered when a party claims that a state court's jurisdiction is pre-empted. Such a determination of congressional intent and of the boundaries and character of a pre-empting congressional enactment is one of federal law. Pre-emption, the practical manifestation of the Supremacy Clause, is always a federal question." *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 388 (1986) (citations omitted).

laws with respect only to those offerings that actually qualify as "covered securities" according to the regulations that the SEC has promulgated.

Next, the appellees urge us to avert our eyes from the statute's plain language and look instead to legislative intent as supposedly espoused by the gloss on which they, and the district court, rely. But resorting to legislative history is always a risky endeavor, subject to manipulation by individual legislators and by simple mistakes of fact by the courts. While legislative history may sometimes usefully add to our understanding of a statute where the statutory language is ambiguous, it cannot alter the plain meaning of the text. "To avoid a law's plain meaning in the absence of ambiguity would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." *Violette v. P.A. Days, Inc.*, 427 F.3d 1015, 1017 (6th Cir. 2005) (quoting in part *Dep't of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 134-35 (2002)). *See Hamdan v. Rumsfeld*, 548 U.S. __, 126 S. Ct. 2749, 2815 (2006) (Scalia, J., dissenting) ("We have repeatedly held that [] reliance [on legislative history] is impermissible where . . . the statutory language is unambiguous."). Here, the statute is not ambiguous. Had Congress possessed the political will to preempt state Blue Sky laws in their practical entirety, it would have expressed that decision in the statute's plain text. Therefore, we reverse the district court, and hold that NSMIA preempts state securities registration requirements only with respect to securities that actually qualify as "covered securities" under federal law.

**2**

The appellees next argue that Earthboard's 1999 offering actually qualified for Rule 506 exemption, thereby triggering NSMIA preemption of state regulation respecting "covered securities." 15 U.S.C. § 77r(a)(1)(A) ("no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof – (1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that – (A) is a covered security . . . ."). In assessing their claim, we note that "[f]ederal preemption is an affirmative defense upon which the defendants bear the burden of proof." *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005). *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). As the Supreme Court has held in the specific context of the National Labor Relations Act:

> The precondition for pre-emption, that the conduct be "arguably" protected or prohibited, is not without substance. It is not satisfied by a conclusory assertion of pre-emption and would therefore not be satisfied in this case by a claim, without more, that Davis was an employee rather than a supervisor. If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board. The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation. In this case, therefore, because the pre-emption issue turns on Davis' status, the Union's claim of pre-emption must be supported by a showing sufficient to permit the Board to find that Davis was an employee, not a supervisor. Our examination of the record leads us to conclude that the Union has not carried its burden in this case.

*Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. at 394-95 (citations omitted). Although *Davis* was a labor case and did not arise from an appeal of a federal court's grant of summary judgment, the basic principles for successfully asserting federal preemption as an affirmative defense on summary judgment are sufficiently clear: it is first incumbent on the party moving for summary judgment to

demonstrate that federal preemption potentially applies to the facts and circumstances of the suit, and, if so, the movants must adduce sufficient evidence, interpreted in a light most favorable to the non-moving party, to prove that there is no genuine issue of material fact contradicting the claim that the case at bar actually and unquestionably qualifies for federal preemption. The first step presents a purely legal determination, but the second raises a mixed question. Should the movants fail to meet their burden with respect to the latter step, such as if a genuine issue of material fact exists regarding the claim's actual qualification for federal preemption, the matter must be determined by the factfinder. *See id.*

In this case, the parties agree that the Earthboard offering was made pursuant to the company's 1999 filing for a registration exemption under Rule 506, 17 C.F.R. § 230.506, and so preemption potentially applies because NSMIA preempts state registration requirements with respect to securities "covered" by such exemptions. To meet the remainder of their burden on summary judgment, the movants' "claim of pre-emption must be supported by a showing sufficient to permit" us to find that no genuine issue of material fact exists contradicting their claim that Earthboard's offering was actually a "covered security." *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. at 395. Rule 506 was promulgated pursuant to Section 4(2) of the 1933 Securities Act, 15 U.S.C. § 77d(2), and exempts certain "limited offers and sales" so long as the rule's conditions are met: (1) all terms and conditions of Rules 501 and 502, 17 C.F.R. §§ 230.501-502, must be met, including the provision of audited balance sheets to unaccredited investors; (2) the issuer "must reasonably believe that there are no more than 35 purchasers of securities" who are *not* "accredited investors" as defined by Rule 501, 17 C.F.R. § 230.501, though there are no limits on the number of accredited investors;[5] (3) each non-accredited investor must meet certain qualifications as recited in 17 C.F.R. § 230.506(a)(2)(ii);[6] and (4) the offers or sales of securities registered under Regulation D must be integrated as part of a single offering, and so no offers or sales may be made more than six months before, or six months after, the offering itself. 17 C.F.R. § 230.502(a).[7]

---

[5] An "accredited investor" refers to any person who, or whom the issuer reasonably believes to be, *inter alia*, "[a]ny natural person who individual net worth . . . at the time of his purchase exceeds $1,000,000," 17 C.F.R. § 230.501(a)(5), or whose individual income exceeds $200,000 annually in each of the two most recent years, whose family income (including that of the spouse), exceeds $300,000 during that period, and who "has a reasonable expectation of reaching the same income level in the current year." 17 C.F.R. § 230.501(a)(6). 17 C.F.R. § 230.501(e)(1)(iv) specifically exempts "accredited investors" from the calculation of the number of purchasers, so therefore a Rule 506 offering could have up to 35 non-accredited investors, and as many accredited investors as it could convince to make the purchase.

[6] "Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description." 17 C.F.R § 230.506(b)(2)(ii).

[7] 17 C.F.R. § 230.502(a) requires: "Integration. All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D. Offers and sales that are made more than six months before the start of a Regulation D offering or are made more than six months after completion of a Regulation D offering will not be considered part of that Regulation D offering, so long as during those six month periods there are no offers or sales of securities by or for the issuer that are of the same or a similar class as those offered or sold under Regulation D, other than those offers or sales of securities under an employee benefit plan as defined in rule 405 under the Act. NOTE: The term offering is not defined in the Act or in Regulation D. If the issuer offers or sells securities for which the safe harbor rule in paragraph (a) of this § 230.502 is unavailable, the determination as to whether separate sales of securities are part of the same offering (i.e. are considered integrated) depends on the particular facts and circumstances. Generally, transactions otherwise meeting the requirements of an exemption will not be integrated with simultaneous offerings being made outside the United States in compliance with Regulation S. The following factors should be considered in determining whether offers and sales should be integrated for purposes of the exemptions under Regulation D: (a) Whether the sales are part of a single plan of financing; (b) Whether the sales involve issuance of the same class of securities; (c) Whether the sales have been made at or about the same time; (d) Whether the same type of consideration is being received; and (e) Whether the sales are made for the same general purpose."

The appellees assert that they have demonstrated that the offer actually qualified for Rule 506 exemption, but the only concrete evidence that they introduce to demonstrate actual compliance indicates that there were fewer than 35 non-accredited investors involved in the purchase, thereby satisfying the rule's numerosity requirement. Although the appellees argue that the sales to Brown were sufficiently integrated with the 1999 filing so as to meet Rule 506's integration requirement, the appellees leave unexplained precisely how a sale of securities three years after the filing nevertheless remains integrated with the original filing, and so we find that there remains a genuine issue of material fact with respect to the Rule's integration requirement.

Even assuming *arguendo* that the appellees successfully demonstrated integration, they still have not adduced any evidence with respect to the requirements mandating that the company provide certain information to unaccredited investors and that the company evaluate all unaccredited investors as being sufficiently sophisticated. Moreover, we find it highly persuasive, albeit not dispositive, that in 2005 the SEC filed a still-pending civil suit against Earthboard and Jeffreys in which it specifically complained that the company had offered unlawfully unregistered shares for sale, and that the offering did not qualify for a federal registration exemption under Rule 506. The SEC alleged that the offering did not satisfy Rule 506 because (1) Earthboard had failed to supply every unaccredited investor with audited copies of the company's financial statements and (2) Earthboard had failed to comply with the requirement that all unaccredited investors actually have, or that the company "reasonably believe[d]" them to have "such knowledge and experience of financial and business matters" as to be capable of evaluating the merits of risks of their prospective investment. *Securities and Exchange Comm'n v. Jeffreys et al.*, 1:05-cv-00372-RWR-DAR (D. D.C.). Therefore we hold that the appellees have failed to meet their burden because a genuine issue of material fact exists as to whether the shares sold to Brown were "covered securities" warranting NSMIA preemption from state law, and so summary judgment was not warranted.

The appellees raise two other arguments in support of their claims to preemption. They are both specious. First, Vaughn notes that the preliminary notes to Regulation D state that the

> [a]ttempted compliance with any rule in Regulation D does not act as an exclusive election; the issuer can also claim the availability of any other applicable exemption. For instance, an issuer's failure to satisfy all the terms and conditions of Rule 506 shall not raise any presumption that the exemption provided by section 4(2) of the Act is not available.

17 C.F.R. §§ 230.501-508, Preliminary Notes, n. 3 (2005). *But see id.* at n. 6 ("regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act."). Vaughn also notes that Rule 508(a) provides a safeguard for insignificant deviations from the express terms of Regulation D if the error was made in good faith. 17 C.F.R. § 230.508(a). Based on this, Vaughn seems to argue that Earthboard's noncompliance was subject to the safe harbor provided by Rule 508; that he is not liable under state law because he is not an underwriter, issuer, or dealer subject to federal registration requirements; and that he was not a "seller" under Kentucky law. We disagree. With respect to the Rule 508 claim, the appellees have not adduced *any* evidence that Earthboard even *attempted* to comply with all of the strictures of Rule 506, much less that the company's deviation from the rule's strictures was both insignificant and done in good faith. We do not reach the merits of Vaughn's claim that he was not liable as a seller under the *federal* registration requirements because it is immaterial to the question of his liability under

Kentucky law, and because he stipulated to his federal "seller" status for the purposes of summary judgment.[8]

We also disagree with Vaughn's contention that he was not, as an unavoidable matter of law, a "seller" under Kentucky law. Although he cites a recent Sixth Circuit opinion wherein we quoted the state trial court for the proposition that "a stock broker who merely executes a trade and has no other interest in the stock other than his commission is not a 'seller'" under Ky. Rev. Stat. Ann. § 292.480, he mistakes the provenance of that opinion. *Excel Energy, Inc. v. Smith (In re Commonwealth Inst. Secs., Inc.)*, 394 F.3d 401, 404 (6th Cir. 2005). That case arose from state securities litigation, but reached the federal courts only with respect to a bankruptcy issue. In that context, both we and the federal district court were estopped from reviewing or re-litigating the state trial court's determinations as to securities fraud liability. Moreover, the state's court of appeals and supreme court both dismissed the plaintiff's appeal in *Excel* only because of a timeliness issue, so those courts had no opportunity to review the merits of the state trial court's interpretation of Section 292.480. *Excel Energy, Inc. v. Commonwealth Inst. Secs., Inc.*, 37 S.W.3d 713 (Ky. 2000). As such, our reiteration of the state trial court's determination, and the state appellate courts' apparent approval of the trial court's decision, possesses little precedential value. Moreover, that case is readily distinguished from the case now before us because Vaughn's alleged role in soliciting and selling Earthboard's shares to Brown, including his admission that he received a "commission" from Earthboard for his efforts, suggests far greater participation in the complained-of sale than that of a stockbroker who merely transacts the business of his clients. Under the circumstances as they have been alleged, Vaughn does not merit summary judgment on the "seller" issue.

Second, Lincoln claims that Brown has effectively waived his Blue Sky claim by admitting that the offering was private. Lincoln is simply mistaken. It is true, as the district court ruled, that the exclusive *federal* cause of action for failure to register public or private securities lies under Section 12(a)(1) of the 1933 Securities Act, 15 U.S.C. § 77l(a)(1), *see Faye L. Roth Revocable Trust v. UBS Painewebber Inc.*, 323 F. Supp. 2d 1279, 1299 (S.D. Fla. 2004), and it is also true that Section 12(a)(2) of the same act, 15 U.S.C. § 77l(a)(2), is inapplicable to private offerings. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995). Brown included a Section 12(a)(1) claim in his original complaint, which the district court found to be time-barred, and his Section 12(a)(2) claim was defeated by his admission that the Earthboard offering was private. But Brown has raised neither of those issues on appeal. Instead, he appeals only from the district court's dismissal of his state claim. There is a fundamental difference between a lawfully-registered private offering, a lawfully-unregistered private offering (that is to say, one that actually qualifies for a registration exemption), and an unlawfully-unregistered private offering. Brown here claims that (1) the Earthboard offering fell into the last category, which, after NSMIA, is the only category of offerings still liable for state non-registration, and (2) the appellees have failed to meet their burden of proving that the offering was actually and lawfully exempted from federal (and, *a fortiori*, state) registration requirements. For the purposes of the instant summary judgment motion, we agree. Therefore, Brown's admission that the Earthboard offering was private has no bearing on state claim, and we reverse the district court's grant of summary judgment with respect to the state registration claim against Vaughn.[9]

---

[8] In so ruling, we note that our decision does not foreclose the district court from exercising its discretion to allow a future summary judgment motion should the parties submit more evidence respecting the question of whether the offering actually qualified for federal preemption.

[9] We have not yet had occasion, nor do we have occasion today, to decide whether a plaintiff's concession that an offering was private, and subject to § 12(a)(1) liability, prevents him from later arguing that the offering was public pursuant to § 12(a)(2).

**B**

Brown also appeals from the district court's grant of summary judgment with respect to his securities fraud claim. Brown filed this action pursuant to Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C §78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R § 240.10b-5,[10] and a virtually identical state statute, Ky. Rev. Stat. Ann. § 292.320(1).[11] The basic elements of a federal securities fraud action pursuant to Rule 10b-5 and Section 10(b), and, by extension, of a Kentucky securities fraud action, are: (1) a material misrepresentation or omission; (2) *scienter*; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Vaughn and Lincoln both dispute that Brown has created a genuine issue of material fact with respect to three elements of securities fraud: *scienter*, reliance, and loss causation.

**1**

*Scienter* is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 2 (1976). "Our task is thus to determine whether the Complaint alleges facts that, if true, would, by forming the basis for a strong inference, 'convince a reasonable person that the defendant knew a statement was false or misleading.'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005) (citation omitted). We therefore employ a "totality of circumstances" test in assessing whether a plaintiff has adequately alleged *scienter*, and among the factors that we have considered in the past are

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Ibid.* As we have noted elsewhere, *scienter*

> is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers

---

[10] "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5 (2006).

[11] The state statute reads: "(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly: (a) To employ any device, scheme, or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." Ky. Rev. Stat. Ann. § 292.320(1) (2006).

which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Platsis v. E.F. Hutton & Co.*, 946 F.2d 38, 40 (6th Cir. 1991) (citations and internal quotation marks omitted). "In securities fraud claims based on statements of present or historical fact – such as the claims Plaintiffs bring in this case – *scienter* consists of knowledge or recklessness." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004). "Specific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion in public statements, may support a strong inference of scienter." *Id.* at 686.

Last year, we held that the plaintiff in a securities fraud case had sufficiently alleged reckless *scienter* with respect to a professional broker who had recklessly participated in a Ponzi scheme, lost money in that scheme, and encouraged others to participate in the scheme:

> While [the defendant] contends that he truly believed [the fraud's author] and that he himself lost money in the purported trades, these facts do not controvert the evidence that [the defendant] encouraged people to invest in a program, the details of which he knew virtually nothing. In view of [the defendant's] former employment at several well-known brokerage firms, this Court has little trouble concluding that [he] knew, or should have known[,] that [the fraud's author's] scheme was fraudulent. The Court therefore concludes that [the defendant] acted with the requisite scienter to establish liability under the anti-fraud provisions of the securities laws.

*Securities and Exchange Comm'n v. George*, 426 F.3d 786, 793-94 (6th Cir. 2005). Brown now contends that the instant case presents a set of circumstances analogous to that of *George*, as he alleges that Vaughn had solicited prospective investors to invest in the Earthboard offering, encouraged them to invest without having performed any investigation of his own,[12] and profited thereby by receiving, by his own admission, a "commission" from the company for his efforts on their behalf in addition to his own purchase of shares at one-sixth of the price that he solicited Brown to pay.

The appellees counter that *George* is inapplicable because the defendant in that case was "more than a casual participant," and had raised more than two million dollars from investors and spent approximately $619,000 of that amount on himself and his friends. *Id.* at 785. The *George* defendant had also known that the money he paid to investors was wrongly characterized as "profits," though he did not in fact know whither the money went or whence the money came. With respect to the instant circumstances, the appellees note that Vaughn actually believed that the investment was worthwhile because he believed that Earthboard was involved in negotiations with VANS, a subjective belief that Brown seems to concede to be an accurate characterization.

We think that Brown has successfully alleged Vaughn's *scienter* and has adduced sufficient evidence to withstand summary judgment. Vaughn is a licensed securities professional who, by his trade, is fully cognizant of the prohibitions contained in federal securities laws, and, as in *George*, should be aware of fraudulent schemes such as this one. Yet he received a tip from an insider at

---

[12]Vaughn claims in his defense that he met Jeffreys, visited Earthboard's office, toured its plant, and observed the manufacturing process. However, in his own deposition, he first declares that he conducted that meeting and visit in early 2001, but then he seems to correct himself and admit that he did not meet with Jeffreys or visit the company until March 2002. Whatever the relative credibility of those two statements, for the purposes of summary judgment they indicate the existence of a genuine issue of material fact as to whether he even met Earthboard's president or conducted any investigation of the company prior to soliciting Brown's purchase. As Vaughn is the moving party, we must review the facts in the light most favorable to Brown.

Earthboard to the effect that the company was engaged in unannounced merger negotiations with a public company at that time, undoubtedly a material non-public fact about a publicly-traded company, and that tip included remarkably precise details about the deal's probable outcome. Of course, acting on that tip would almost certainly have been illegal had the insider not entirely invented it, though it is noteworthy that the tipper himself is currently serving a prison sentence for his role in this tawdry affair. But instead of obeying the letter and spirit of the securities laws, Vaughn allegedly chose to enrich himself with illicit gain by abusing the material non-public information he had received, first by purchasing Earthboard securities for his own account, and then by soliciting clients and prospective clients to reap their own rewards in order to advance his own interests by impressing them with his investing acumen. It is inherently reckless for a securities professional to attempt to violate the law, and it is no defense to suggest that he actually believed the tip to be true as that simply further demonstrates his foiled intent to circumvent the law.

Bolstering our conclusion that Brown has sufficiently alleged Vaughn's recklessness, and consequently *scienter*, are the facts that (1) he lied to Brown about his relationship with Jeffreys, which he presumably did in order to enhance the perceived value of his illicit information; (2) he apparently conducted not an iota of due diligence with respect to Earthboard's intrinsic value or the purported transaction with VANS – he did not even discover that Jeffreys was a convicted felon prior to soliciting Brown to buy Earthboard securities, nor did he apparently visit Earthboard's plants or meet with Jeffreys in person until *after* Brown's purchase of Earthboard shares; (3) the supposed one-for-one stock swap set an apparently ridiculous price for Earthboard; (4) he solicited Brown and others to buy the shares at six times the price he had paid only a short time before; and (5) he received a "commission" for his efforts from Earthboard despite the fact that the company was apparently not his client and his claim that he was not "offering" the securities for sale within the meaning of state law.

Moreover, Vaughn's retort that he should be excused because it was impossible to have engaged in any proper due diligence investigation into the purported Earthboard-VANS merger is entirely beside the point. The essential value of material non-public information lies in its lack of transparency, for otherwise it would be impossible to capture the arbitral profit that lies between the "true" price – where the price reflects all information, confidential or otherwise – and the public or discounted (but transparent and lawful) price that incorporates only the information that is known publicly. Unlawfully or illicitly trading on confidential information necessarily makes the tippee dependent on the tipper's reputed knowledge about confidential matters, replacing thereby the research required of lawful market participants, and the resulting conduct not only accomplishes an essential fraud on the market, it also renders the tippee fundamentally vulnerable to precisely the sort of fraud that Earthboard and Jeffreys consummated. *See generally*, Kathleen Coles, *The Dilemma of the Remote Tippee*, 41 Gonz. L. Rev. 181 (2005); Donald C. Langevoort, *Taming the Animal Spirits of the Stock Market: A Behavioral Approach to Securities Regulation*, 97 Nw. U.L. Rev. 135 (2002); Stephen J. Choi, *Selective Disclosures in the Public Capital Markets*, 35 U.C. Davis L. Rev. 533 (2002). That Vaughn also fell victim to this scheme by his own volition does not itself render him immune to liability for his act of passing the tip to others. Therefore we hold that Brown sufficiently alleged Vaughn's *scienter* and adduced sufficient evidence to create a genuine issue of material fact so as to withstand summary judgment at this stage.

## 2

The district court also found that Brown had failed to introduce sufficient evidence to demonstrate that his loss was caused by the appellees' actions. In a private securities fraud action, a plaintiff must prove all "traditional elements of causation and loss" including "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals*, 544 U.S. at 345. Loss causation requires "a causal connection between the

material misrepresentation and the loss." *Id.* at 342. It has been likened to proximate cause in tort law. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 213 (2d Cir. 2000).

Brown asserts that the purported Earthboard-VANS merger was always and entirely fictitious, and that Vaughn's recklessness in exploiting rumors of the merger by soliciting Brown's investment was the direct cause of Brown's financial loss because he "concealed the circumstances that bear upon the loss suffered such that [Brown] . . . would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). In addition, he argues that Vaughn committed a material omission by not telling Brown that he had purchased shares for $1 or less, and he committed a positive misrepresentation when he explained that the price had risen to $6 in anticipation of the Earthboard-VANS merger.

We agree. In the first place, a reasonable trier of fact could find that Brown was induced to make his investment in Earthboard as a result of Vaughn's misrepresentations regarding the Earthboard-VANS transaction and his relationship with Jeffreys. Both alleged misrepresentations created an illusion that Vaughn, a securities professional obviously seeking to impress prospective clients, was passing along reliable, material non-public information. Although the Supreme Court has recently warned that "normally, in cases such as this one (*i.e.*, fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss," *Dura Pharmaceuticals*, 544 U.S. at 342, a small private offering is far more subject than shares trading on large public markets to initial purchase prices that are inflated fraudulently. We believe that could have been the case here. Once it was revealed that the VANS transaction was wholly fictitious, the value of Brown's investment plummeted, for the $6 share price was allegedly predicated on the purported *future* value of Earthboard's shares once the VANS transaction closed. Brown has adduced evidence sufficient to withstand summary judgment that he was induced to invest in Earthboard as a result of Vaughn's reckless misrepresentations, and that the revelation of the truth about the purported VANS merger proximately caused his economic loss.

### 3

Alternatively, the appellees claim that the context of the purchase indicates that Brown could not, as a matter of law, have reasonably or justifiably relied on the information that Vaughn allegedly provided. To support their contention, appellees especially note that the subscription agreement that Brown signed contained an integration clause in which Brown waived any claim that he relied on third party advice in making his purchase. Appellees point to certain decisions by several of our sister circuits for the proposition that non-reliance clauses in sales contracts absolutely foreclose later suits for deceit by prior representation. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir. 2003)*; Rissman v. Rissman*, 213 F.3d 381, 383-84 (7th Cir. 2000); *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411 (1st Cir. 1989); *One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988).

The appellees overstate their case. In the first place, the law of our circuit requires us to engage in a contextual analysis in order to ascertain whether, as a matter of law, a party has introduced sufficient evidence of reasonable reliance to withstand summary judgment. In assessing reasonable or justifiable reliance on summary judgment, we apply a recklessness standard in looking at the context of the asserted reliance. *Wright v. National Warranty Co., L.P.*, 953 F.2d 256, 261 (6th Cir. 1992). Among the factors that we have employed in the past to ascertain reasonable reliance "in a non-insider context" are

(1) The sophistication of expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction

or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Ibid.* To erect a *per se* rule with respect to non-reliance clauses would undermine the essential point of undertaking a contextual analysis, and we do not choose to adopt such a blanket rule now.

Moreover, we do not read the opinions of our sister circuits in the appellees' preferred manner: far from erecting a *per se* rule foreclosing the possibility of recovery for deceit in all situations where an allegedly injured party has signed a non-reliance clause, these opinions simply accord an appropriate weight to evidence of the signing of such a clause in the entire context of the alleged fraud. *AES Corp. v. The Dow Chemical Co.*, 325 F.3d 174, 181 (3d Cir. 2003); *Rogen v. Ilikon Corp.*, 361 F.2d 260, 267-68 (1st Cir. 1966); *Kaufman v. Guest Capital, L.L.C.*, 386 F. Supp. 2d 256, 267-69 (S.D.N.Y. 2005) (noting that the Second Circuit, in *Emergent Capital*, employed a contextual analysis). Finally, it is noteworthy that the appellees were not themselves parties to the subscription agreement containing the non-reliance clause.

Under the unusual factual circumstances of this suit, including the non-reliance clause in the subscription agreement, we do not think that Brown acted unreasonably, as an unavoidable matter of law, in relying on the alleged tip of a securities broker who so obviously wanted to impress a prospective client. Instead, Brown has introduced enough evidence of reasonable reliance to withstand summary judgment at this stage. Based on the evidence before us, therefore, we leave the final determination of reliance to the trier of fact.

## C

Finally, Lincoln argues that, whatever Vaughn's potential liability, it cannot be held secondarily liable as Vaughn's employer. We agree. In the first place, Lincoln qualifies for the good faith safe harbor of Section 20(b) of the 1934 Act for a controlling person who "acted in good faith, and did not directly or indirectly induce the act or acts constituting the violation or the cause of action." Lincoln claims that it had no actual knowledge of, nor any reason to suspect, Vaughn's alleged activities, and no Lincoln employee other than Vaughn had any contact with Brown. No evidence to the contrary has been adduced. Moreover, Lincoln prohibits its employees from "selling away" – selling securities not approved or authorized by the firm – and Brown has introduced no evidence that Lincoln either failed to train its agents properly, or that it ever ratified or authorized Vaughn's actions in any way. In addition, Lincoln is not liable as a controlling person under state statute, Ky. Rev. Stat. Ann. § 292.480(4), for it did not "materially aid[] in the sale or purchase" of the security. *In re Commonwealth Inst. Secs., Inc.*, 286 B.R. 851, 856 (W.D. Ky. 2002), *aff'd*, 394 F.3d at 406. Brown's only evidence that Lincoln may have aided the sale is the simple fact that Vaughn used Lincoln's office equipment to communicate with, and send materials to, Brown. But there is no evidence that Vaughn needed any special, case-by-case, permission to use the office fax machine, and so his use of that machine no more signifies Lincoln's assistance than would be his use of the office telephone.

Finally, Lincoln is not vicariously liable for Vaughn's actions under any express, implied, or apparent agency theory. Vaughn is an independent contractor, and he had no express or implied authority to solicit, offer, sell, or in any fashion participate in the offer or sale of Earthboard stock. Vaughn also had no apparent authority to act in this fashion. "An apparent or ostensible agent is one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, although he has not, either expressly or by implication, conferred authority upon him." *CSX Transp., Inc. v. First Nat'l Bank*, 14 S.W. 3d 563, 568 (Ky. Ct. App. 1999) (citation and internal quotation marks omitted). Under Kentucky law, to impose liability on a principal for the unauthorized acts of an agent, a plaintiff must prove (1) that the principal held the agent out as having the authority to engage in the specific transaction, and (2) that the plaintiff in fact justifiably

relied upon the principal's representation. *Roethke v. Sanger*, 68 S.W.3d 352, 363-64 (Ky. 2001). Brown has simply not adduced sufficient reliable evidence to indicate that Lincoln induced him to believe that Vaughn had the authority to participate in the Earthboard offering. We therefore hold that the district court did not err in granting summary judgment with respect to the appellant's claims against Lincoln.

### III

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment with respect to all of the claims against Vaughn, **AFFIRM** with respect to all of the claims against Lincoln, and **REMAND** for further proceedings consistent with our opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ROSEN, District Judge, concurring, in part, and dissenting, in part. I agree with, and concur in, part II-A of the majority's opinion reversing the district court's grant of summary judgment with respect to Brown's state registration claim on NSMIA preemption grounds. I also agree with, and concur in, part II-C of the majority's opinion affirming the district court's grant of summary judgment with respect to all of Brown's claims against Defendant Lincoln Financial Advisors Corporation.

However, I respectfully dissent from the majority's opinion in part II-B in which the majority reverses the grant of summary judgment as to Brown's securities fraud claim against Defendant Jeffrey Vaughn. Although I agree with the majority that Brown has introduced sufficient evidence of *scienter* and loss causation -- two of the three requisite elements of a securities fraud claim at issue in this case -- I do not believe that Brown has introduced sufficient evidence to establish reasonable reliance, and this failure is fatal to his securities fraud case.[1]

By way of preface to my analysis of Brown's arguments supporting his purported reasonable reliance, I am reminded of a verse from Simon and Garfunkel's 1969 classic song, "The Boxer":

I have squandered my resistance
For a pocketful of mumbles
Such are promises
All lies and jests.
Still a man hears what he wants to hear
And disregards the rest.[2]

Such is the nature of Mr. Brown's reliance, in my view. But beyond Paul Simon's insights into human failings, I also rely upon well-established precedent. In assessing whether a plaintiff's alleged reliance was reasonable, "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them" must be considered. *Emergent Capital Inv. v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2nd Cir. 2003). Although the majority enumerates the various factors for consideration which we delineated in *Wright v. National Warranty Co., L.P.*, 953 F.2d 256, 261 (6th Cir. 1992), *see* majority opinion at pages 15-16, it neglects to discuss *any* of these factors, and instead, finds only that the non-reliance clause in the subscription agreement executed by Plaintiff was insufficient in and of itself to show non-reliance.

In my view, applying the factors set forth in *Emergent Capital* and *Wright*, Brown's "reliance" is not only not reasonable, it is virtually non-existent beyond the fact that Vaughn made the representations to him -- a fact which by itself is simply not sufficient as a matter of law.

---

[1] Although the district court did not address the reliance issue, the issue was fully briefed and argued before both the district court and this court. In ruling on a district court's grant of summary judgment, an appellate court does not have to rely on the same reasons that persuaded the lower court. *See City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 251 (6th Cir.1994) (an appellate court may affirm a decision of the district court if that decision is correct for any reason, including a reason not considered by the district court); *see also Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 986 (6th Cir. 2003).

[2] "The Boxer", ©1968 Paul Simon.

The record here demonstrates that Brown, by his own statement, was a sophisticated businessman who founded a marketing research firm that he sold for $22 million. He had a great deal of prior investment experience, multiple brokerage accounts, and the ability to assess risk. Importantly, he had substantial prior experience with private placement investments which demonstrated his knowledge of their high risk profile. [*See* Brown 8/30/04 Dep., pp. 24-30.] He testified that before making private placement investments he consulted with both his attorney and his accountant. He also testified that before investing in Earthboard he consulted with two of his financial advisors. He had no prior business relationship with Defendant Vaughn; the two had only a friendly relationship based on Indiana basketball and occasional golf outings, and the few times they dined together with their families.

Brown admitted in his deposition that he knew that none of Vaughn's information about Earthboard was firsthand, that Vaughn was not personally involved in any merger negotiations, and that Vaughn was simply reporting what Jeffreys had told him. [*See* Brown 10/19/04 Dep., pp. 129-30.] Brown further admitted that he had access to any information about Earthboard that he wanted and that neither Vaughn nor anybody else prevented him from investigating Earthboard. *Id.* pp. 159-62. Where a plaintiff has equal access to information but simply fails to inquire for himself, his claimed reliance is not reasonable or justifiable. *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1410-11 (6th Cir. 1991), citing *Dupuy v. Dupuy* 551 F.2d 1005, 1014 (5th Cir. 1977) ("[o]nly those who have pursued their own interests with care and good faith should qualify for the judicially created private 10b-5 remedies.") This should certainly be even more true for a sophisticated investor such as Brown.

Brown's deposition testimony, however, is not the only evidence that belies his claim of reasonable reliance; he also signed an Earthboard Subscription Agreement that warned him that the investment involved a "high degree of risk" and he categorically acknowledged that in making the investment, he "relied solely upon independent investigations made by [himself] and *by no other third party.*" [*See* 2/28/02 Subscription Agreement, pp. 1, 2]. He also checked the box on the Subscription Agreement indicating that he had knowledge and experience in financial and business matters and in private placement investments and that he was capable of evaluating the merits and risks of an investment in the shares. *Id.* at p. 2. We held in *Wright v. National Warranty Co.*, *supra*, 953 F.2d at 260, that a securities fraud plaintiff is bound by statements made in a subscription agreement. *See also Rissman v. Rissman*, 213 F.3d 381, 383 (7th Cir. 2000) ("Securities law does not permit a party to a stock transaction to disavow such representations -- to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." (citing *Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir. 1996) (plaintiff bound by non-reliance statements in subscription agreement.))

For the foregoing reasons, I believe the record here amply supports a determination that Plaintiff failed to establish reasonable reliance and, therefore, I would affirm the district court's grant of summary judgment on the securities fraud claim on this alternative basis.